**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| SIXTH DISTRICT OF THE AFRICAN METHODIST EPISCOPAL CHURCH, a Georgia nonprofit organization, GEORGIA MUSLIM VOTER PROJECT, a Georgia nonprofit organization, WOMEN WATCH AFRIKA, a Georgia nonprofit organization, LATINO COMMUNITY FUND OF GEORGIA, a Georgia nonprofit organization, DELTA SIGMA THETA SORORITY, INC., a Washington D.C. nonprofit organization on behalf of 7000+ Sorors residing in Georgia, | |
| Plaintiffs, | CIVIL ACTION NO. |
| v. | |
| BRIAN KEMP, Governor of the State of Georgia, in his official capacity, BRAD RAFFENSPERGER, Secretary of State of Georgia, in his official capacity, GEORGIA STATE ELECTIONS BOARD, REBECCA SULLIVAN, DAVID WORLEY, MATTHEW MASHBURN, and ANH LEE, Members of the Georgia State Elections Board, in their official capacities, FULTON COUNTY REGISTRATION AND ELECTIONS BOARD, ALEX WAN, MARK WINGATE, KATHLEEN D. RUTH, VERNETTA K. NURIDDIN, and AARON V. JOHNSON, Members of the Fulton County Registration and Elections Board, in their official capacities, RICHARD L. BARRON, | **COMPLAINT** |

Director of the Fulton County
Registrations and Elections board, in
his official capacity, DEKALB
COUNTY BOARD OF
REGISTRATIONS AND
ELECTIONS, ANTHONY LEWIS,
SUSAN MOTTER, DELE L. SMITH,
SAMUEL E. TILLMAN, and BAOKY
N. VU, Members of the DeKalb
County Board of Registrations and
Elections, in their official capacities,
GWINNETT COUNTY BOARD OF
REGISTRATIONS AND
ELECTIONS, ALICE O'LENICK,
WANDY TAYLOR, STEPHEN W.
DAY, JOHN MANGANO, GEORGE
AWUKU, and SANTIAGO
MARQUEZ, Members of the Gwinnett
County Board of Registrations and
Elections, in their official capacities,
LYNN LEDFORD, Director of the
Gwinnett County Board of
Registrations and Elections, in her
official capacity, COBB COUNTY
BOARD OF ELECTIONS AND
REGISTRATION, PHIL DANIELL,
FRED AIKEN, PAT GARTLAND,
JESSICA M. BROOKS, and DARYL
O. WILSON, JR., Members of the
Cobb County Board of Elections and
Registration, in their official capacities,
JANINE EVELER, Director of the
Cobb County Board of Elections and
Registration, in her official capacity,
HALL COUNTY BOARD OF
ELECTIONS AND REGISTRATION,
TOM SMILEY, DAVID KENNEDY,
KEN COCHRAN, CRAIG LUTZ, and
GALA SHEATS, Members of the Hall
County Board of Elections and

Registration, in their official capacities,
LORI WURTZ, Director of Hall
County Elections, in her official
capacity, CLAYTON COUNTY
BOARD OF ELECTIONS AND
REGISTRATION, DARLENE
JOHNSON, DIANE GIVENS,
CAROL WESLEY, DOROTHY F.
HALL, and  PATRICIA PULLAR,
Members of the Clayton County Board
of Elections and Registration, in their
official capacities, SHAUNA DOZIER,
Clayton County Elections Director, in
her official capacity, RICHMOND
COUNTY BOARD OF ELECTIONS,
TIM MCFALLS, SHERRY T.
BARNES, MARCIA BROWN,
TERENCE DICKS, and BOB
FINNEGAN, Members of the
Richmond County Board of Elections,
in their official capacities, LYNN
BAILEY, Richmond County Elections
Director, in her official capacity, BIBB
COUNTY BOARD OF ELECTIONS,
MIKE KAPLAN, HERBERT
SPANGLER, RINDA WILSON,
HENRY FICKLIN, and CASSANDRA
POWELL, Members of the Bibb
County Board of Elections, in their
official capacities, and JEANETTA R.
WATSON, Bibb County Elections
Supervisor, in her official capacity,
BIBB COUNTY BOARD OF
REGISTRARS, VERONICA SEALS,
Bibb County Chief Registrar, in her
official capacity, CHATHAM
COUNTY BOARD OF ELECTIONS,
THOMAS J. MAHONEY, MALINDA
HODGE, MARIANNE HEIMES, and
ANTAN LANG, Members of Chatham

County Board of Elections, in their
official capacities, CHATHAM
COUNTY BOARD OF
REGISTRARS, COLIN MCRAE,
WANDA ANDREWS, WILLIAM L.
NORSE, JON PANNELL, and
RANDOLPH SLAY, Members of the
Chatham County Board of Registrars,
in their official capacities, CLARKE
COUNTY BOARD OF ELECTION
AND VOTER REGISTRATION,
WILLA JEAN FAMBROUGH,
HUNAID QADIR, ANN TILL,
ROCKY RAFFLE, and ADAM
SHIRLEY, Members of the Clarke
County Board of Election and Voter
Registration, in their official capacities,
CHARLOTTE SOSEBEE, Clarke
County Board of Election and Voter
Registration Director, in her official
capacity, COLUMBIA COUNTY
BOARD OF ELECTIONS, ANN
CUSHMAN, WANDA DUFFIE, and
LARRY WIGGINS, Members of the
Columbia County Board of Elections,
in their official capacities,
COLUMBIA COUNTY BOARD OF
REGISTRARS, NANCY L. GAY,
Columbia County Chief Registrar, in
her official capacity,

       Defendants.

## INTRODUCTION

1.      As the United States Supreme Court has explained, the right to vote is "a fundamental matter in a free and democratic society." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966).  "No right," the Court has held, "is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  That is because voting is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

2.      More than 5 million Georgians exercised that right in the 2020 General Election ("General Election").  Nearly 4.5 million did so again in the 2021 Runoff Elections ("Runoff Elections") for two seats in the United States Senate.  A record number of votes were cast in both elections.

3.      Voters of color—in particular Black voters—were especially motivated to make their voices heard.  In advance of the General Election, there was a 25% increase in Black voter registration as compared to 2016.  And while Black turnout has in the past dropped significantly in special elections, in the Runoff Elections, Black voters turned out in historic numbers—Black turnout in the Runoff Elections was almost 92% of that in the General Election, a higher percentage than for white voters.

4.      These record turnout numbers are all the more remarkable given that they did not occur in just any election, but rather in two elections that took place in

the middle of a global pandemic—a pandemic that has disproportionately affected people of color.  And the COVID-19 pandemic was not the only challenge facing voters of color.  For years, in fact, Georgia's elected officials have erected an array of barriers that have made it more difficult for voters of color to vote.

5.    Georgia has a record of racially discriminatory voting practices; as one Court noted, "The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof." *Brooks v. State Bd. of Elections*, 848 F. Supp. 1548, 1560 (S.D. Ga. 1994).

6.    From 1965 to 2012, when Georgia was required under the Voting Rights Act of 1965 ("VRA") to seek federal clearance for changes to its election laws, Georgia's racially discriminatory practices required federal intervention 187 times.

7.    Since the Supreme Court's 2013 decision in *Shelby County v. Holder*, 570 U.S. 529 (2013), Georgia has unleashed a myriad of changes to its elections laws, leaving it to Black and other voters of color to demonstrate which of these changes have discriminatory purpose or effect.

8.    Georgia has been unrelenting in its effort to suppress the political participation of people of color.  In fact, of the states previously covered by the VRA's federal preclearance requirements, Georgia is the only state that has enacted voting restrictions across five major categories studied by the U.S.

Commission on Civil Rights: voter identification requirements, documentary proof of citizenship, voter purges, cuts to early voting, and polling place closures or relocations.  These barriers have made it materially more difficult to vote for historically disenfranchised communities, including people of color as well as voters with disabilities, elderly, students, and poor voters.

9.      But in the General Election and the Runoff Elections, many of these voters overcame such substantial barriers, in part due to the efforts of organizations, like Plaintiffs in this case, that expended efforts and resources to ensure that Georgians could cast their lawful vote.

10.      Countless Black Georgians waited for hours in needlessly long lines, where they were comforted and sustained by free water and refreshments offered by an array of civic and religious organizations, including parishioners of Plaintiff Sixth District of the African Methodist Episcopal Church ("AME Church").

11.      Other Georgians, including those who worked long days and multiple jobs and could not wait in such lines, returned their ballots to a secure, video-monitored drop box—an option they learned about from Plaintiff Georgia Muslim Voter Project ("GAMVP") and Plaintiff Delta Sigma Theta Sorority, Inc. ("the Deltas").

12.      Still others, such as the young immigrant women and other Georgians who receive support from Plaintiffs Women Watch Afrika ("WWA") and the

Deltas, took advantage of early voting, eager and proud to cast a lawful ballot in their new country.

13.     Spanish-speaking Latinx Georgians, meanwhile, were able to confidently cast absentee ballots after receiving in-language voter education materials from the Latino Community Fund of Georgia ("LCF Georgia").

14.     In the General Election and Runoff Elections, citizens across the State of Georgia—from Columbus to Augusta, from Valdosta to Blairsville, from Atlanta to Macon, and everywhere in between—cast votes using a host of lawful means.  They voted in person, during early voting and on Election Day; they voted by mail, returning absentee ballots to secure drop boxes and to the United States Postal Service; and some, in Fulton County, Georgia's most populous, voted in mobile voting units.

15.     The General Election in Georgia was celebrated not only because of record turnout, but also because of its integrity.  The losing presidential candidate and his allies launched an unsubstantiated attack on the integrity of the election and sought to reverse its results, claiming that it was beset by fraud.  But each of the baseless allegations underlying this attack were rebuked, both by judges in lawsuits and by Georgia's own state and local election officials.  Secretary of State Brad Raffensperger affirmed that the election was "secure, reliable, and efficient." Indeed, his office conducted a comprehensive audit and investigation of the claims of wrongdoing, which showed, as Secretary Raffensperger wrote to Congress, "that

there is nowhere close to sufficient evidence to put in doubt the result of the presidential contest in Georgia," and that they were not "seeing anything out of the ordinary scope of regular post-election issues."  Governor Kemp has disputed unsubstantiated claims of election fraud in Georgia, calling those conspiracy theories "simply a distraction."  Lieutenant Governor Duncan also pushed back against the "amount of misinformation that continues to fly around."  Specifically, he noted that he was troubled that "some folks are willing, just for the sole intent of flipping an election, of spreading misinformation."  Georgia Voting Systems Manager Gabriel Sterling has also refuted allegations and conspiracy theories of election fraud, stating that "[e]verybody's vote did count [in November]."

16.    In short, in a safe and secure election, a record number of Georgians performed democracy's most vital act: they voted.

17.    Then, on March 25, 2021, the Georgia General Assembly and Governor Brian Kemp made that most vital act more difficult.

18.    With no valid justification—and with little opportunity for any, let alone meaningful, public input and review—the Georgia General Assembly enacted Senate Bill 202 ("S.B. 202"), a sweeping series of provisions that make it harder for certain Georgians to vote.  These provisions—purported solutions in search of a problem—include: (a) an unnecessary restriction on the use of mobile voting units; (b) new and burdensome identification requirements that force a voter to provide identification or sensitive personal information when requesting and

casting an absentee ballot  ("ID Requirements"); (c) a delayed and compressed time period for requesting absentee ballots; (d) limitations on the use of secure drop boxes as a means of returning absentee ballots; (e) a drastic reduction in early voting in runoff elections; (f) a cruel and inhumane ban—with criminal penalties—on anyone who provides free food and water or other assistance, known as "line warming," to Georgians who wait in line to vote; and (g) the complete disenfranchisement of some voters who cast out-of-precinct provisional ballots.

19.    These provisions will affect all Georgia voters.  But consistent with Georgia's long and ongoing record of discrimination, the burdens will be disproportionately felt by voters of color, especially Black voters.  These historically disenfranchised voters lack IDs or access to obtaining them; they use early and weekend voting, especially on Sundays, when Plaintiff AME Church and other churches encourage voting through "Souls to the Polls" events; they require access to secure drop boxes; they rely on water and other support to withstand the long lines they wait in to vote; and they are more likely to move and cast provisional ballots.

20.    Each of S.B. 202's challenged provisions independently make it more difficult for historically disenfranchised communities to vote.  Cumulatively, however, the burden is even more severe—by restricting absentee voting, limiting the availability of drop boxes, and shortening early voting, S.B. 202 will force more voters to the polls on Election Day.  For some Georgians, this inconvenience

may be manageable.  But for voters of color and other historically disenfranchised communities—who *already* suffer through disproportionately longer lines than white voters—it could be dramatic.  And rather than receive a simple bottle of water while waiting in an even longer line, those voters may now be forced to wait for hours, and those who seek to alleviate voters' exhaustion by providing water or other refreshments risk criminal prosecution.

21.     This burden is not an accident.  Nor is it legal.  S.B. 202's challenged provisions deny voters of color a full and equal opportunity to participate in the political process.  By design and as a result, these provisions—both on their own and in their aggregate effect—violate both Section 2 of the VRA, and the rights of voters of color under the Fourteenth and Fifteenth Amendments to the United States Constitution.

22.     S.B. 202's challenged provisions further violate the right to vote of *all* Georgia voters, as protected by the First and Fourteenth Amendments to the United States Constitution.  Any state restriction on the right to vote, no matter how slight, "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."  *Crawford v. Marion Cnty. Election Bd*., 553 U.S. 181, 191 (2008) (quotation marks omitted).  S.B. 202 imposes a severe burden on this fundamental right—yet there are no state interests that justify that burden.

23.     S.B. 202's line warming ban violates another of Georgians' constitutional rights: their right to political speech and expression, as protected by

the First Amendment.  Through providing water and other resources, Plaintiff AME Church and others throughout Georgia engage in "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).  This is protected speech under the First Amendment, and S.B. 202's attempt to restrict that speech—via the imposition of criminal penalties—is unconstitutional.

24.     S.B. 202's restrictions on absentee voting also places unlawful burdens on the rights of more than 1.2 million Georgia voters with disabilities.  Through its new restrictions, S.B. 202 erects hurdles that impair, if not preclude, these voters from Georgia's absentee voting program, denying them the benefits of this opportunity and subjecting them to discrimination as a result of their disability.

25.     For each of these reasons, S.B. 202's challenged provisions violate federal law and the United States Constitution.  But the harm extends even further: these provisions are an attack on democracy itself.  Voting is our democracy's most sacred right.  "Other rights, even the most basic, are illusory if the right to vote is undermined."  *Wesberry*, 376 U.S. at 17.  With the enactment of S.B. 202, the State of Georgia has undermined that right, especially for voters of color.  That enactment must be enjoined.

## PARTIES

### Plaintiffs

26.     Plaintiff AME Church is a nonprofit religious organization.  The national AME Church, of which the Sixth District, which includes Georgia, is a part, traces its roots to 1816 as the first independent Protestant denomination founded by Black people in response to segregation and discrimination in the Methodist Episcopal Church.  Today, there are more than 500 member-churches who are part of the AME Church in Georgia, with 36 congregations and tens of thousands of members in Atlanta alone, a majority of whom are Black and many of whom are registered voters in Georgia.

27.     The national AME Church has always placed a strong emphasis on social justice initiatives.  Many civil rights leaders and activists have been among its most prominent members, including the anti-lynching journalist Ida B. Wells-Barnett, and Oliver Brown, the AME minister who sued on behalf of his school-age daughter in the landmark Supreme Court case *Brown v. Board of Education*. Encouraging and supporting civic participation among its members is a core aspect of the AME Church's work.  Advocating for the right to vote, regardless of whom that vote is for, and encouraging the AME Church's eligible members to vote has been a priority of the church.  The civil rights march from Selma to Montgomery in Alabama was organized in and began at the steps of Brown Chapel AME Church in Selma.  After they were beaten by Alabama State Troopers on the

Edmund Pettus Bridge on "Bloody Sunday," the wounded marchers fled back to the sanctuary of Brown Chapel.  The Sixth District's activities in support of voter participation reflect this history.  Those activities are, and have been at all times, conducted on a nonpartisan basis.  During the Civil Rights Movement, AME member churches served as organizational centers for Black civil rights leaders.  Today, AME Church continues to encourage civic participation by holding "Souls to the Polls" events to transport churchgoers to polling locations during early voting periods, registering voters for elections, hosting "Get Out the Vote" ("GOTV") efforts to increase voter turnout, and providing food, water, encouragement, and assistance to voters waiting in lines at polling locations.  Prior to the General Election, AME Church approached the Secretary of State of Georgia to offer up every single one of its Georgia churches to serve as polling sites if needed.

28.     AME Church has members across Georgia whose right to vote will be burdened or denied because of S.B. 202.

29.     By severely restricting mobile voting units for advance voting and Election Day, placing additional ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in runoff elections, restricting and penalizing groups for distributing food and water to voters waiting in line to cast a ballot, and disenfranchising otherwise eligible voters who cast a provisional ballot in their

county but outside their precinct, S.B. 202 makes it substantially more difficult for AME Church to engage in its civic-engagement activities and further its mission. AME Church will be forced to divert resources from its day-to-day activities in order to combat the suppressive effects of S.B. 202. As a result, AME Church is limited, and will continue to be limited, in the resources that it can devote to its other core organizational goals.

30.    Plaintiff GAMVP is a nonpartisan, nonprofit organization whose mission is to activate and elevate the voices of Muslim voters in Georgia regardless of whom they support. In furtherance of this mission, GAMVP holds voter registration drives, civic engagement workshops, voter education forums, and participates in GOTV efforts, including the provision of food and drink to voters waiting in line to cast a ballot, in Bibb, Chatham, Clarke, Cobb, Columbia, DeKalb, Fulton, Gwinnett, and Richmond Counties and is actively seeking to expand its efforts statewide. GAMVP also provides resources to Muslim voters on advance in-person voting, drop box voting, and voting by mail through their phone-banking and text-banking programs and through use of other multimedia. GAMVP has and continues to serve Muslims of all race and ethnic backgrounds, including the growing Black Muslim community in Georgia. GAMVP also works with a wide range of age groups. For instance, GAMVP has held civic engagement workshops for teenagers at Islamic schools as well as voter education sessions at mosques with a focus on their elder members. Many of the

communities that GAMVP works with will be directly impacted and harmed by the unlawful provisions of S.B. 202.

31.     By severely restricting mobile voting for advance voting and Election Day, placing additional ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in runoff elections, restricting and penalizing groups for distributing food and water to voters waiting in line to cast a ballot, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 makes it substantially more difficult for GAMVP to carry out its civic-engagement mission.  These burdens will force GAMVP to divert time, money, and resources from their other activities, such as their census and redistricting education workshops, to assist Georgia voters who are burdened by the provisions of S.B. 202, particularly the historically disenfranchised communities that GAMVP serves.  Therefore, S.B. 202 adversely impacts GAMVP's overall operations.

32.     Plaintiff WWA is a nonpartisan, nonprofit organization that seeks to promote the social and economic development and health equity of women and girls with an emphasis on immigrant and refugee women of African nations.  In furtherance of its mission, WWA runs a robust civic engagement program that includes Voting and Civil Rights Awareness Trainings to engage refugee and immigrant communities in the metro-Atlanta area.  WWA also participates in

GOTV and election protection activities, which includes providing food and water to voters waiting in long lines, organizing transportation for voters to vote in person or by drop box, and providing assistance to voters casting a ballot in-person or by absentee who speak French, Swahili, Arabic, and Amharic, and to illiterate voters.  WWA is a member of the Georgia Immigrant Rights Alliance, which advocates for expanded voting rights access for immigrant communities throughout the state of Georgia, and is a member of the Southern Movement Assembly to provide African refugees and immigrants across Georgia with voter education information.  Many of the voters they serve will be directly impacted and harmed by the unlawful provisions of S.B. 202.

33.     By severely restricting mobile voting units for advance voting and Election Day, placing additional ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in runoff elections, restricting and penalizing groups for distributing food and water to voters waiting in line to cast a ballot, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 makes it substantially more difficult for WWA to engage in its mission to promote the social and economic development of women and girls from refugee and immigrant communities, including the civic engagement of voters in those communities.  These burdens will force WWA to divert time, money, and resources from their other activities—such as its Safe

Birth Initiative, which provides cultural sensitivity training to healthcare workers that serve refugee women and Health Advocates Program and  has trained over 100 refugee and immigrant women in becoming health advocates—to assist Georgia voters who are burdened by the provisions of S.B. 202.  Therefore, S.B. 202 adversely impacts WWA's overall operations.

34.     Plaintiff Delta Sigma Theta Sorority, Inc. is a national, nonpartisan, not-for-profit membership service organization, comprised predominately of Black women, that was founded in 1913 on the campus of Howard University and incorporated under the laws of the District of Columbia.  Six weeks after the organization was initially formed in 1913, several of its founding members marched in the historic Suffragist March under the Delta Sigma Theta Sorority, Inc. banner—the Deltas' first public act.  The Deltas' participation in the march took on personal risk and indignity with not being welcomed by some white suffragists, who insisted that the Black women march at the end of the procession. Civic engagement has remained a core tenet of the Deltas' mission since its founding, as democracy and justice can only be achieved through voting.  Thus voter registration and voter education programs, as well as combatting voter suppression, are some of the organization's top social action priorities.  In light of the upcoming post-census redistricting cycle, the Deltas have and will continue to provide public education and training about the importance of the decennial census and its impact on redistricting, the allocation of funding, and policy-making.  The

organization has 58 chapters that include alumnae and college chapters and approximately 7,587 members in Georgia, most of whom are registered voters in Georgia.

35.     Consistent with its mission, the Deltas have hosted candidate forums and informational events on voting, including on how to regain the right to vote in Georgia after a felony conviction.  In 2014, shortly after the 2013 *Shelby County* decision immobilized an effective voting protection, the Deltas, along with other organizations, successfully opposed one of many efforts the Georgia legislature attempted to drastically reduce early voting.  In the recent electoral cycles, including the General Election and Runoff Elections, the Deltas dedicated resources to help organize a civic engagement and education campaign in the state, including voter registration drives, reminders to voters to request absentee ballots, and purchases of billboards and yard signs with reminders to vote.  During the 2021 legislative cycle, the Deltas, specifically members of the Decatur Alumnae Chapter, testified in opposition to Senate Bills 29, 67, 70, 71, and 73, which, similar to S.B. 202, proposed to restrict absentee voting or the ability to participate in runoff elections.  The Deltas' testimony forewarned that such restrictions would disproportionately harm voters of color in Georgia.

36.     With S.B. 202's enactment, the right to vote of the organization's members across Georgia will be severely burdened or denied.  By severely restricting mobile voting units for advance voting and Election Day, placing

additional ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in federal runoff elections, restricting and penalizing groups for distributing food and water to voters waiting in line to cast a ballot, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 makes it substantially more difficult for the Deltas to engage in its civic engagement mission.  These burdens would force the Deltas to divert time, money, and resources from other activities, such as their voter registration and voter education efforts, including related to the post-census redistricting cycle, to assist Georgia voters who are burdened by the provisions of S.B. 202.  Therefore, S.B. 202 adversely impacts the Delta's overall operations.

37.     Plaintiff LCF Georgia is an organization comprised of thirty Latinx-led organizations serving Latinx communities across Georgia.  Its mission is to be a catalyst for investment and collaborative work with and within the Latinx community.  As part of this mission, LCF Georgia provides critical resources to Spanish-speaking and Portuguese-speaking voters across the state, including the translation of materials, civic engagement training, voter education materials regarding absentee voting, early voting, and voting by drop box.  For instance, LCF Georgia launched and coordinated the Latinos for Democracy coalition, which reached every Latinx voter in Georgia at least twice in the 2020 primaries and provided support to voters on Election Day as part of its election protection

program.  LCF Georgia also operates and coordinates an active text-to-vote and phone-banking operation, sends bilingual mailers with voting information, and runs a canvass program, which provides information to voters in English and Spanish.  Many of LCF Georgia's member organizations and the voters they serve will be directly impacted and harmed by the unlawful provisions of S.B. 202.

38.    By severely restricting mobile voting units for advance voting and Election Day, placing additional ID Requirements and restrictions on requesting and casting an absentee ballot, severely limiting the number and use of drop boxes, reducing the early voting period in runoff elections, restricting and penalizing groups for distributing food and water to voters waiting in line to cast a ballot, and disenfranchising otherwise eligible voters who cast a provisional ballot in their county but outside their precinct, S.B. 202 makes it substantially more difficult for LCF Georgia to engage in its civic-engagement activities and further its mission. These burdens will force LCF Georgia to divert time, money, and resources from their other activities, such as programs to provide low-fee or free skill-building and technical assistance to Latinx-serving nonprofits and their staff, in order to assist Georgia voters who are burdened by the provisions of S.B. 202, particularly the voters from historically disenfranchised communities.  Therefore, S.B. 202 adversely impacts LCF Georgia's overall operations.

## **Defendants**

39.     Defendant Brian Kemp is the Governor of the State of Georgia, and is sued in his official capacity.  Defendant Kemp has the chief executive power of the state, Ga. Const. art. 5, § 2, and signed the challenged statutes into law on March 25, 2021.  As Governor, Defendant Kemp has sole authority to declare that a state of emergency or disaster exists, O.C.G.A. § 38-3-51.

40.     Defendant Brad Raffensperger is the Secretary of State of Georgia and the chief elections official of the State, O.C.G.A. § 21-2-210.  Defendant Raffensperger is responsible for implementing elections statutes and routinely issues guidance to the county election officials of all 159 counties on various elections procedures and requirements.  Defendant Raffensperger is named as a Defendant in his official capacity.

41.     Defendant Georgia State Elections Board (the "State Board") is responsible for "formulat[ing], adopt[ing], and promulgat[ing] such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections; and, upon the adoption of each rule and regulation, the board shall promptly file certified copies thereof with the Secretary of State and each superintendent."  O.C.G.A. § 21-2-31(2).

42.     Defendants Rebecca Sullivan, David Worley, Matthew Mashburn, and Anh Le are members of the State Board and are named as Defendants in their official capacities.  The members of the State Board are responsible for

"promulgat[ing] rules and regulations so as to obtain uniformity in the practices and proceedings of superintendents, registrars, deputy registrars, poll officers, and other officials, as well as the legality and purity in all primaries and elections." O.C.G.A. § 21-2-31(1).

43.     Defendant Fulton County Registration and Elections Board is responsible for the conduct of primary and general elections in Fulton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

44.     Defendants Alex Wan, Mark Wingate, Kathleen D. Ruth, Vernetta Keith Nuriddin, and Aaron V. Johnson are the Members of the Fulton County Registration and Elections Board, reside in Fulton County, and are sued in their official capacities.

45.     Defendant Richard L. Barron is the Director of the Fulton County Registration and Elections Board, and is sued in his official capacity.  Defendant Barron is responsible for the day-to-day operations of running elections in Fulton County, to the extent such power does not conflict with the power of the Secretary of State.

46.     Defendant DeKalb County Board of Registration & Elections is responsible for the conduct of primary and general elections in DeKalb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

47.     Defendants Anthony Lewis, Susan Motter, Dele Lowman Smith, Samuel E. Tillman, and Baoky N. Vu are the Members of the DeKalb County Board of Registration & Elections, reside in DeKalb County, and are sued in their official capacities.

48.     Defendant Erica Hamilton is the Director of Voter Registration and Elections in DeKalb County, and is sued in her official capacity.  Defendant Hamilton is in charge of the day-to-day operations of running elections in DeKalb County, to the extent such power does not conflict with the power of the Secretary of State.

49.     Defendant Gwinnett County Board of Registrations and Elections is responsible for the conduct of primary and general elections in Gwinnett County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

50.     Defendants Alice O'Lenick, Wandy Taylor, Stephen W. Day, John Mangano, George Awuku, and Santiago Marquez are the Members of the Gwinnett County Board of Registrations and Elections, reside in Gwinnett County, and are sued in their official capacities.

51.     Defendant Lynn Ledford is the Director of the Gwinnett County Board of Registrations and Elections, and is sued in her official capacity. Defendant Ledford is responsible for the day-to-day operations of running

elections in Gwinnett County, to the extent such power does not conflict with the power of the Secretary of State.

52.     Defendant Cobb County Board of Elections and Registration is responsible for the conduct of primary and general elections in Cobb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

53.     Defendants Phil Daniell, Fred Aiken, Pat Gartland, Jessica M. Brooks, and Darryl O. Wilson, Jr. are the Members of the Cobb County Board of Elections and Registration, reside in Cobb County, and are sued in their official capacities.

54.     Defendant Janine Eveler is the Director of the Cobb County Board of Elections and Registration, and is sued in her official capacity.  Defendant Eveler is responsible for the day-to-day operations of running elections in Cobb County, to the extent such power does not conflict with the power of the Secretary of State.

55.     Defendant Hall County Board of Elections and Registration is responsible for the conduct of primary and general elections in Hall County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

56.     Defendants Tom Smiley, David Kennedy, Ken Cochran, Craig Lutz, and Gala Sheats are the Members of the Hall County Board of Elections and Registration, reside in Hall County, and are sued in their official capacities.

57.     Defendant Lori Wurtz is the Hall County Elections Director, and is sued in her official capacity.  Defendant Wurtz is responsible for the day-to-day operations of running elections in Hall County, to the extent such power does not conflict with the power of the Secretary of State.

58.     Defendant Clayton County Board of Elections and Registration is responsible for the conduct of primary and general elections in Clayton County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

59.     Defendants Darlene Johnson, Diane Givens, Carol Wesley, Dorothy Foster Hall, and Patricia Pullar are the Members of the Clayton County Board of Elections and Registration, reside in Clayton County, and are sued in their official capacities.

60.     Defendant Shauna Dozier is the Clayton County Elections Director, and is sued in her official capacity.  Defendant Dozier is responsible for the day-to-day operations of running elections in Clayton County, to the extent such power does not conflict with the power of the Secretary of State.

61.     Defendant Richmond County Board of Elections is responsible for the conduct of primary and general elections in Richmond County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

62.     Defendants Tim McFalls, Sherry T. Barnes, Marcia Brown, Terence Dicks, and Bob Finnegan are the Members of the Richmond County Board of Elections, reside in Richmond County, and are sued in their official capacities.

63.     Defendant Lynn Bailey is the Richmond County Elections Director and the Richmond County Chief Registrar, and is sued in her official capacity. Defendant Bailey is responsible for the day-to-day operations of running elections in Richmond County, to the extent such power does not conflict with the power of the Secretary of State.

64.     Defendant Bibb County Board of Elections is responsible for the conduct of primary and general elections in Bibb County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

65.     Defendants Mike Kaplan, Herbert Spangler, Rinda Wilson, Henry Ficklin, and Cassandra Powell are the Members of the Bibb County Board of Elections, reside in Bibb County, and are sued in their official capacities.

66.     Defendant Jeanetta R. Watson is the Bibb County Elections Supervisor, and is sued in her official capacity.  Defendant Watson is responsible for the day-to-day operations of running elections in Bibb County, to the extent such power does not conflict with the power of the Secretary of State.

67.     Defendant Bibb County Board of Registrars is responsible for the registration of voters in Bibb County, consistent with state statutes and the guidance of the Secretary of State.

68.     Defendant Veronica Seals is the Chief Registrar of Bibb County, and is sued in her official capacity.

69.     Defendant Chatham County Board of Elections is responsible for the conduct of primary and general elections in Chatham County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

70.     Defendants Thomas J. Mahoney, Malinda Hodge, Marianne Heimes, and Antan Lang are the Members of the Chatham County Board of Elections, reside in Chatham County, and are sued in their official capacities.

71.     Defendant Chatham County Board of Registrars is responsible for the registration of voters in Chatham County, consistent with state statutes and the guidance of the Secretary of State.

72.     Defendants Colin McRae, Wanda Andrews, William L. Norse, Jon Pannell, and Randolph Slay are the Members of the Chatham County Board of Registrars, reside in Chatham County, and are sued in their official capacities.

73.     Defendant Clarke County Board of Election and Voter Registration is responsible for the conduct of primary and general elections in Clarke County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

74.     Defendants Willa Jean Fambrough, Hunaid Qadir, Ann Till, Rocky Raffle and Adam Shirley are the Members of the Clarke County Board of Election

and Voter Registration, reside in Clarke County, and are sued in their official capacities.

75.     Defendant Charlotte Sosebee is the Director of the Clarke County Board of Election and Voter Registration, and is sued in his official capacity. Defendant Sosebee is responsible for the day-to-day operations of running elections in Clarke County, to the extent such power does not conflict with the power of the Secretary of State.

76.     Defendant Columbia County Board of Elections is responsible for the conduct of primary and general elections in Columbia County, O.C.G.A. §§ 21-2-40; 21-2-70, consistent with state statutes and the guidance of the Secretary of State.

77.     Defendants Ann Cushman, Wanda Duffie, and Larry Wiggins are the Members of the Columbia County Board of Elections, reside in Columbia County, and are sued in their official capacities.

78.     Defendant Columbia County Board of Registrars is responsible for the registration of voters in Columbia County, consistent with state statutes and the guidance of the Secretary of State.

79.     Defendant Nancy L. Gay is the Chief Registrar of Columbia County, and is sued in her official capacity.

## JURISDICTION AND VENUE

80.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States of America.

81.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a), 42 U.S.C. §§ 1983 and 1988(a), and 52 U.S.C. § 10308(f) because this action seeks to redress the deprivation, under color of state law, of rights, privileges, and immunities secured by the First, Fourteenth, and Fifteenth Amendments to the U.S. Constitution and Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

82.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

83.     This Court has personal jurisdiction over the Defendants, who are sued in their official capacities only.

84.     Venue is proper in the U.S. District Court for the Northern District of Georgia pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), and under Local Civ. R. 3.1, because several Defendants reside in this district and this division and a substantial part of the events that gave rise to Plaintiffs' claims occurred in this judicial district.  Plaintiffs AME Church, GAMVP, WWA, the Deltas, and LCF of Georgia all operate within this district and division.

# FACTUAL ALLEGATIONS

A. **Georgia has a long history and ongoing record of imposing voting restrictions in a racially discriminatory manner.**

85.    S.B. 202 is nothing new—it builds on a long line of official actions taken for invidious purposes.  Georgia's history of racially discriminatory voting practices is well-established and judicially-recognized.  *See*, *e.g.*, *Brooks*, 848 F. Supp. at 1560 ("The history of the state['s] segregation practice and laws at all levels has been rehashed so many times that the Court can all but take judicial notice thereof."); *Johnson v. Miller*, 864 F. Supp. 1354, 1379-1380 (S.D. Ga. 1994), *aff'd and remanded*, 515 U.S. 900 (1995) ("[W]e have given formal judicial notice of the State's past discrimination in voting, and have acknowledged it in the recent cases."); *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs.*, 950 F. Supp. 2d 1294, 1314 (N.D. Ga. 2013), *aff'd in part, vacated in part, rev'd in part and remanded*, 775 F.3d 1336 (11th Cir. 2015) ("Generally, Georgia has a history chocked full of racial discrimination at all levels.  This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.  Racism and race discrimination were apparent and conspicuous realities, the norm rather than the exception.") (quoting *Brooks*, 848 F. Supp. at 1560).

86.    Georgia's long history of voter suppression dates back to the post-Civil War period when the Ku Klux Klan used widespread violence to intimidate Black and Republican voters to re-establish white supremacy.  Georgia's Black voters have historically been disenfranchised through a variety of election laws,

including grandfather clauses, literacy tests, poll taxes, and the adoption of "white primaries."

87.     The Fourteenth Amendment granted Black men the right to vote in 1868.  That same year, 33 Black members were elected to the Georgia General Assembly, who were subsequently expelled "solely on account of color."

88.     Congress passed the Fifteenth Amendment on February 26, 1869.  By late 1870, all the former Confederate states had been readmitted to the Union and most were controlled by the Republican Party, due primarily to the support of Black voters.

89.     Following the end of Reconstruction in 1877, in a deliberate effort to disenfranchise Black voters, Georgia and other southern states enacted literacy tests, grandfather clauses, poll taxes and other discriminatory voter registration practices.

90.     In 1877, Georgia authorized a poll tax, but most white voters bypassed the provision through exemptions for those whose ancestors fought in the Civil War or who could vote before the war.  Thus, Georgia became the first state to enact a "poll tax" to disenfranchise many poor Black voters.  The poll tax was only abolished in 1945, after it had been in effect for nearly 75 years.

91.     The Democratic Party in Georgia adopted "white primaries" in 1900, which as the name suggests, allowed only white voters to vote in primaries. Grantham at 3 n.21.  This practice continued in Georgia until it was held

unconstitutional 45 years later in *King v. Chapman*, 62 F. Supp. 639, 650 (M.D. Ga. 1945) ("The defendants acting as the duly constituted authorities of the Democratic Party, in refusing to permit plaintiff to vote in the Primary of July 4, 1944, solely on account of his race and color, deprived the plaintiff of a right secured to him by the Constitution and laws of the United States, and was in violation of the Fourteenth, Fifteenth and Seventeenth Amendments."), *aff'd*, 154 F.2d 460 (5th Cir. 1946).

92.    In 1908, Georgia adopted a constitutional amendment with the express purpose of disenfranchising Black voters by writing into the constitution the principle of "white primaries."  Hoke Smith ran successfully for governor in 1906 with this constitutional amendment as a key part of his campaign platform: "I favor a constitutional amendment which will insure a continuation of white supremacy . . . [and] the protection of the white primaries . . . .The effect of the disfranchisement amendment was to legalize what already existed in Georgia . . . it drastically reduced his vote in the general election.  Negro suffrage in the country and small towns was almost completely eliminated, while it suffered severely in the larger towns and cities."

93.    In 1958, Georgia passed a new voter registration act that required those who were illiterate to satisfy "understanding tests" by correctly answering 20 of 30 questions related to citizenship posed by the voting registrar.

94.    Terrell County, Georgia, was the subject of the first court action under the Civil Rights Act of 1957, in which a challenge to literacy tests for voting was found to have subjected Black voters to "distinctions in the registration process on the basis of their race and color."

95.    In 1961, the U.S. Commission on Civil Rights reported that "the problem of denials of the right to vote because of race appears to occur in only eight Southern States—Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee. . . ."  The report noted that in many rural counties of Georgia, there was "total exclusion from the suffrage" for Black voters. The report concluded that "[t]he right to vote without distinctions of race or color—the promise of the 15th amendment—continues to suffer abridgment," and that there was evidence of "discriminatory disenfranchisement" in Georgia.

96.    Beginning in 1965, with the passage of the VRA, Georgia was one of nine states whose records of racist voter suppression laws required them, under Section 4(b) of the VRA, to get federal preclearance for changes to their election rules.  Georgia's inclusion in this group was based on the State's enforcement of unconstitutional tests or devices and low voter registration and turnout rates.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312-13 (1966) ("Section 4(b) of the Act also embraces [Georgia]" due to "evidence of actual voting discrimination.").

97.     From 1965 to 2012, Georgia's racially discriminatory voting schemes necessitated federal intervention 187 times, including over 91 objections since 1982, when Section 5 of the VRA was reauthorized.

98.     In 2013, the Supreme Court in *Shelby County* invalidated the coverage provision that determined which jurisdictions were subject to the VRA's preclearance requirement.  570 U.S. 529.  Georgia, a formerly covered jurisdiction, immediately began to impose restrictions on voting rights without first obtaining approval from the Department of Justice or the United States District Court for the District of Columbia and satisfying their burden that the law did not worsen the ability to vote of communities of color.

99.     Since *Shelby County* was decided, Georgia has continually sought to suppress the vote of people of color, and Black voters in particular.  In 2020, on the seventh anniversary of *Shelby County*, the late Representative John Lewis warned, "A rampant war is being waged against minorities' voting rights in my home state of Georgia."

100.   Indeed, in many respects, the state's legacy of voter suppression is unparalleled.  Georgia is the only state formerly covered by the VRA's preclearance requirement that has enacted voting restrictions across five major categories studied by the U.S. Commission on Civil Rights: voter ID requirements, documentary proof of citizenship, voter purges, cuts to early voting, and polling

place closures or relocations.  Since 2011, more voting rights lawsuits have been filed against Georgia and its officials than any other state except Texas.

101.   After *Shelby County*, state and local officials and lawmakers have sought to curtail the voting rights of Black voters at every stage of the process, from registration, to early voting, to election day itself.  The examples catalogued below are but a sampling of the "rampant" race-based voter suppression in Georgia.

102.   ***Registration Deadlines***.  Georgia's registration deadline—29 days before an election—is one of the strictest in the country.  In 2018, a disproportionate number of the 87,000 voters who became ineligible due to late registration were people of color.  In one congressional district, the number of ineligible voters was nearly 14 times the margin of victory.

103.   ***Exact Match Registration Rejections***.  From 2010 to 2016, then-Secretary of State Brian Kemp employed an administrative policy that disproportionately rejected voter registrations from people of color.  Under Defendant Governor Kemp's "exact match" policy, a voter's registration application would not be accepted if the information therein did not perfectly match—down to a hyphen, an accent mark, or the inclusion of a middle initial—records held by the Georgia Department of Drivers Services or the Social Security Administration.  By race, the population of voters attempting to register was 47.2% white, 29.4% Black, 3.6% Hispanic, and 2.6% Asian—but among applicants who

failed the exact match verification procedure, only 13.6% were white, while 63.6% were Black, 7.9% were Hispanic, and 4.8% were Asian.  Only in response to litigation did Secretary Kemp agree to process approximately 34,000 applications that had been suspended.

104.   But in 2017, the state enacted legislation codifying a version of the "exact match" protocol.  Shortly before Georgia's 2018 gubernatorial election between then-Secretary of State Kemp and former state representative Stacey Abrams, the Associated Press reported that Kemp's office had placed on hold more than 50,000 voter registrations due to the exact match law.  And although Georgia's population was 32% Black, nearly 70% of the affected applications belonged to Black voters.

105.   ***Voter Purges***.  Georgia's refusal to register eligible voters goes hand in hand with its aggressive purges of registered voters from the voter rolls.  Few states have removed voters as aggressively as Georgia.

106.   In 2010, when then-Secretary Kemp took office, nearly 379,000 voters were removed from the rolls.  After *Shelby County*, Georgia escalated the purges:  by 2014, the number of voters whose registrations were cancelled rose to 517,000.  Georgia purged approximately 1.5 million voters between the 2012 and 2016 election—twice as many as it had between the 2008 and 2012 election.  On a single day in July 2017, then-Secretary Kemp removed 560,000 voters—8% of Georgia's registered voters—from the rolls.  Of the removed voters, 107,000 were

taken off the rolls merely because they had not voted in prior elections, not because they had moved or become ineligible for some other reason. The purge, according to the *Atlanta Journal-Constitution*, may have been "the largest mass disenfranchisement in U.S. history."

107. Further, voter purges disproportionately affect Black voters and voters of color. Among those eliminated from voter rolls in 2017, Black voters were canceled at a higher rate than white voters likely because they had not voted in prior elections.

108. The purges, moreover, have an extraordinarily high error rate. In 2019, then-Secretary Kemp purged 313,000 voters from the rolls on the grounds that they had moved from the address provided in their registration. An expert study concluded that 198,000 of these voters, or 63.3%, had not actually moved. And a disproportionate number of voters whose registrations were erroneously cancelled were Black or nonwhite.

109. ***Eligibility Challenges***. Almost a week into early voting for the Runoff Elections, True the Vote, a Texas-based organization perpetuating the myth of voter fraud, in partnership with some Georgia voters, claimed it initiated mass challenges to the voting eligibility of more than 360,000 Georgia voters. Tens of thousands of Georgia voters were ultimately subjected to baseless, untimely, and potentially discriminatory challenges. The overwhelming majority of submitted mass challenges were dismissed by counties for lack of probable cause. Some of

the counties that dismissed the mass challenges even faced a second and third wave of mass voter challenges.  But these types of baseless and potentially discriminatory mass challenges are not new to Georgia voters.  As just one example, in 2015, in the runup to municipal elections in the City of Sparta, registered Black voters were subjected to mass challenges to their eligibility.  The challenged voters, nearly all of whom were Black, comprised less than 20% of the city's electorate.

110.  ***Criminal Investigations***.  In 2014, the State launched a criminal investigation into the New Georgia Project after the voter turnout group registered 85,000 new voters.  The State found purported problems with only 0.03% of the registrations, and no charges were filed.  The State recently renewed similar criminal investigations in light of the historic turnout in the General Election.  The State has again targeted the New Georgia Project along with individual voters, many of whom are voters are color.

111.  ***Changes to Election Dates***.  In 2012, the Georgia legislature changed the dates of nonpartisan county elections from November to July.  The city of Augusta attempted to exempt itself, passing a local law providing that Augusta conducted elections as a municipality, not a county.  A Georgia lawmaker proposed a "clean-up" bill that would have deemed all consolidated Georgia governments as counties for election purposes.  In December 2012, the U.S. Department of Justice blocked the bill under the VRA preclearance process.  But

after *Shelby County*, state lawmakers successfully rescheduled Augusta's nonpartisan elections to July, against the wishes of the city council.  From the outset, it was clear that moving the election date would disproportionately affect turnout for Black voters.

112.   ***Cuts to Early Voting***.  It is well-established that Black voters, both in Georgia and nationally, regularly vote early when possible and comprise a disproportionate number of early voters.  Nonetheless, the Georgia legislature has repeatedly pushed to restrict the availability of early voting.  Starting in 2011, Georgia cut early voting in half, from 45 days to 21 days.

113.   A few years later, in 2014, lawmakers proposed a bill that would have further reduced early voting to just 6 days for small consolidated cities.  That same year, one lawmaker explained that he opposed Sunday voting at a local mall because it was "dominated by African American shoppers" and was "near several large African American mega churches" and that he "prefer[red] more educated voters than a greater increase in the number of voters."

114.   During the next legislative session in 2015, legislators unsuccessfully sought to further reduce early in-person voting from 21 days to 12 days.  That same bill would have restricted the availability of Sunday voting, which is disproportionately popular among Black voters.

115.   In 2018, legislators proposed to shorten voting hours on Election Day in Atlanta, which is majority-Black and the most populous city in Georgia, from

8:00 p.m. to 7:00 p.m.  A legislator in the House of Representative also proposed a version of this bill that would have effectively eliminated early voting on the Sunday before Election Day statewide.

116.  ***Polling Place Closures***.  Counties across the state have closed polling locations despite an overall increase in registered voters.  One study found that since 2013, 10% of Georgia's polling locations have been shuttered.

117.  Examples of polling place closures that disproportionately burden voters of color are legion.  From 2012 to 2018, county election officials closed 214 polling locations, or nearly 8% of the state's polling places, as a result of precinct consolidation.  Many of these closures occurred in communities with substantial minority populations, making it more difficult for Black voters and other voters of color to cast their ballots.

118.  In 2015, election officials in Macon-Bibb County proposed reducing the number of precincts from 40 to 26.  Many of the proposed closures were once again located in predominantly Black communities.  Under the proposal, several majority Black precincts would have more than 5,000 voters, whereas no majority white precincts would reach that threshold, and most had thousands fewer voters than the proposed precincts in Black communities.  In response to community opposition, the County did not close as many precincts as it had proposed initially,

but the majority of the eventual closures still disproportionately affected Black voters.

119.   In 2016, the polling place for a precinct with significant Black voters was relocated to a sheriff's office.  Civil rights organizations and Macon-Bibb County residents raised concerns about how siting a polling location at a law enforcement office would intimidate and deter voters from exercising their voting rights, especially for Black voters.  These organizations and residents eventually succeeded in blocking the relocation, and the polling place was moved to a church-owned facility.  But when the organizers complained, they were told that "if people weren't criminals, they shouldn't have a problem voting inside of a police station."

120.   In 2018, the Randolph County Board of Elections and Registration proposed eliminating seven out of nine polling places in the predominantly Black county.  The proposal was made on the advice of a consultant hired by the county board after its elections supervisor abruptly quit.  The consultant had been "highly recommended" by Secretary of State Kemp's office.  At the time, Black Georgians constituted 32% of the State but 61% of Randolph County.  One of the polling places that the Board sought to close served a population that was 97% Black. After public outcry and the threat of litigation, the county backtracked.

121.   In 2020, Cobb County—Georgia's third largest county—decided to cut the number of early voting sites for the Runoff Elections from 11 to 5, despite the need to serve more than 537,000 voters.  The closures were concentrated in

communities of color:  most of the county's Black and Latinx voters lived in an area that had previously had four polling places; Cobb County consolidated these sites into a single location.  Black and Latinx voters are more likely to live in poverty than other residents and to have more difficulty traveling long distances due to limited public transportation options.  The polling place closures would have disproportionately deterred voters of color from participating in the runoffs.  After public outcry and the threat of litigation, the county added two sites and moved the location of a third.  Cobb County was just one of several in Georgia that sought to close polling locations for the critical Senate runoffs.

122.  ***Long Wait Times***.  Polling place closures have led to failures in election administration, especially unacceptably long wait times.  Voters of color, moreover, are more likely than white voters to experience long lines.  Studies have repeatedly confirmed the racial disparity in voting wait times.  For instance, one study found that Black and Latinx voters waited 45% longer than white voters— and that the racial waiting gap could not be explained by the level of resources across counties.

123.  The nationwide trend holds true in Georgia, as well.  During one election, the average wait time after 7 p.m. was 6 minutes in polling places that were 90% white and 51 minutes in polling places that were 90% nonwhite.  In other words, the wait times for nonwhite voters were 8.5 times longer than the wait times for white voters.

124.   In Cobb County, whose voters are 27.6% Black, 13% Latinx, and 5.4% Asian, early voters during the General Election encountered lines up to 10 hours long.  As noted, however, the county persisted in reducing early voting sites for the Runoff Elections.

125.   *Vote Dilution*.  In addition to erecting outright barriers to the franchise, Georgia has also systematically attempted to dilute the votes of nonwhite voters.  In 2015, Georgia enacted H.B. 566, which redrew certain legislative districts for the Georgia House of Representatives.  Two of those districts were challenged as racial gerrymanders:  after an influx of voters of color, their boundaries were redrawn to prevent voters of color from electing candidates of their choice and ensuring the election of white incumbents.

### B.   Georgia has an increasing number of voters of color.

126.   Notwithstanding the backdrop of these discriminatory provisions, Georgia voters of color, and other historically disenfranchised groups, have sought to play a more active role in the political process.

127.   Georgia is home to an increasing population of Black voters and other voters of color.  In the past 30 years, Georgia's Black population has nearly doubled—from 1.8 million in 1990 to 3.5 million in 2019.  Of Georgia's total population of approximately 10.6 million, as of July 2019, 60.2% are white, 32.6% are Black, 9.9% are Latinx, and 4.4% are Asian.

128.   Between October 2016 and October 2020, Georgia added nearly a quarter-million Black and Latinx voters to its voter registration rolls.  Meanwhile, the white share of the state's electorate declined, dropping by ten percentage points since 2008.

129.   Black eligible voters account for nearly half of Georgia's electorate growth since 2000.  Between 2000 and 2019, Georgia saw the largest percentage increase among Black voters of any state in the country.  The population of Black voters in the state reached a record high of 2.5 million eligible voters in 2019—a third of the state's total electorate.

130.   Latinx and Asian people also make up a growing share of the Georgia electorate.  The Latinx and Asian voting populations in the state more than tripled in size from 2000 to 2019.

131.   This growth among nonwhite voters has been especially prominent in the Atlanta metro area.  Metro Atlanta is home to 3.9 million registered voters— over half of the state's electorate in 2020.  Between 2016 and 2020, the area saw an increase of 115,000 Black voters, 64,000 Latinx voters, and 53,000 Asian voters.  During that same time period, Latinx and Asian people increased as a share of the electorate in every Atlanta metro area county.

132.   According to the 2019 American Community Survey ("ACS"), the following counties are home to a sizeable population of color: Bibb County (54.4% Black, 3.3% Latinx, 2% Asian); Clayton County (69.3% Black, 13.2% Latinx,

5.1% Asian); Cobb County (27.6% Black, 13% Latinx, 5.4% Asian); DeKalb County (54.0% Black, 8.5% Latinx, 6.1% Asian); Fulton County (44.1% Black, 7.2% Latinx, 7.1% Asian); Gwinnett County (27.8% Black, 21.2% Latinx, 11.6% Asian); Hall County (7.2% Black, 28.4% Latinx, 1.8% Asian); and Richmond County (56.5% Black, 4.9% Latinx, 1.9% Asian).

133.   Despite their increasing population growth, the Black and Latinx populations in Georgia still trail behind the white population on many socioeconomic measures.

134.   According to the ACS, Black and Latinx residents (18.8% and 19.1% of those populations, respectively) experience poverty at nearly twice the rate of white residents (10%).  White per capita income ($38,435) is nearly double Black ($24,215) and Latinx ($20,066) per capita income.  The 2019 median income for white households was $70,832, compared to the median of Black households of $47,096, and Latinx households of $52,661.

135.   Black and Latinx households in Georgia are also substantially less likely to own a vehicle: 11.7% of Black households and 7.2% of Latinx households lack a vehicle, as compared to 3.6% of white households.  Relatedly, as compared to white residents, Black residents are more than four times as likely and Latinx residents are more than twice as likely to use public transportation to commute to work.

136.   According to the ACS, Black households in Georgia are also more than 1.5 times as likely to live without broadband internet access than white households.

137.   These inequalities have contributed to the limited number of candidates of color elected to state-wide offices, despite the State's changing demographics and the increasing number of such candidates running for office since 2000.

138.   Voting in Georgia is highly racially polarized.  For example, in the 2008 presidential election, Barack Obama secured 98% of Black voter support in Georgia and only 23% of white voter support.  Similarly, 93% of Black voters supported Stacey Abrams for governor in 2018, compared to only 25% of white voters.  And in the Runoff Elections, Black voters' candidates of choice, Reverend Raphael Warnock and Jon Ossoff, won with roughly 94% of the Black vote compared to 29% of the white vote.  The majority of Latinx and Asian voters also choose candidates different than their white counterparts in the state.  For instance, Warnock and Ossoff received double the share of the Latinx (64%) and Asian (60%) vote than the white vote.

### C.   Black voter participation reached historic levels in the General Election and the Runoff Elections.

139.   In November 2020, Georgians went to the polls to vote for President, two U.S. Senators, and a number of local offices.  Because none of the candidates running for U.S. Senate in either race received the threshold 50% vote necessary to

avoid a runoff election under Georgia law, both Senate elections went to a runoff, held in January 2021.

140.   In both the General Election and the Runoff Elections, Georgia voters turned out in record numbers.  Whereas 4.1 million Georgians voted in the 2016 general election, 5 million voters cast ballots in the General Election despite the challenges of the COVID-19 pandemic.  Turnout jumped to more than 67% of eligible voters, from 59% in 2016, breaking the state's record of 63% set in 2008.

141.   While turnout typically declines significantly for runoff elections (specifically among Black voters, and particularly as compared to elections where a presidential election is on the ballot), that was not true in January 2021.  More than 4.4 million Georgians returned to the polls for the Runoff Elections.  Black voter turnout was 91.8% of that in November's General Election.

142.   A significant driver of the record-breaking turnout in both elections was the historic participation of Black voters.  Of the over 5 million Georgians who voted in the General Election, 30% were Black.  This followed a 25% increase in Black voter registration in 2020 as compared to 2016.

143.   Much of this increase in turnout is attributable to higher rates of absentee voting.  In the General Election, more than 1.3 million absentee ballots were cast.  That marks a five-fold increase over the number of absentee ballots cast in the state in 2016.  Nearly 30% of Black voters cast their ballot by mail in 2020, compared to only 24% of white voters.  Candidates preferred by Black voters

received a higher percentage of absentee votes relative to their overall percentage of the final vote count.

144.   The high rates of voting by mail, coupled with the total absence of any voter fraud, illustrate that additional voting options are not only safe but also necessary.  These additional voting options help, for example, alleviate lines during in-person early voting and decrease in-person voting demand on Election Day.  These options remain necessary to ensure that voters from historically disenfranchised communities who, for a variety of reasons, depend on alternatives to in-person voting on Election Day, exercise their right to vote.

145.   The increase in absentee voting was due, in part, to the use of drop boxes.  They allow voters to submit their absentee ballots in advance of election day, avoiding the risks of delay or loss attendant to sending a ballot through the mail.  Secure drop boxes were used with high frequency in majority-minority counties.  Fulton County voters used secure drop boxes for more than half of the absentee ballots cast in the General Election.

146.   Early in-person voting was another major driver of increased turnout. Approximately 2.7 million Georgians voted early in person in the General Election.  More than 2 million voters cast early in-person ballots in the Runoff Elections.  Early voting turnout was particularly high in counties with large minority populations, with some counties seeing upward of a 500% increase.

147.   Yet, despite the unprecedented use of absentee voting, the high voter turnout resulted in long lines at many polling places both during early voting and on Election Day.  This was markedly true at polling places serving neighborhoods primarily comprised of Black people.  Indeed, while on Election Day polls closed at 7 p.m., individuals who are in line by the time the polls close are allowed to vote, and the vast majority of polling places that had to stay open late to ensure those waiting in line could cast their ballots were in majority-Black neighborhoods. Some voters waited hours to vote.

148.   As part of an effort to help voters sustain their strength and make it to the voting booth despite these long lines, Georgia organizations brought and then provided free food and water to polling places.  These efforts contributed to turnout numbers in neighborhoods described above, where wait-times sometimes stretched for hours.

149.   Together, these opportunities—in concert with extraordinary efforts by organizations focused on increasing minority voter participation and registration—resulted in historic electoral outcomes.  Black voters' preferred presidential candidate won Georgia's electoral votes for the first time in three decades.  Black voters also successfully elected their candidates of choice in runoff elections for both of Georgia's U.S. Senate seats, including Reverend Raphael Warnock, elected as the first Black person to represent Georgia in the United States Senate.  Exit polls following the Runoff Elections indicated that over 90%

of Black voters supported Reverend Warnock and fellow Democratic candidate

Jon Ossoff, who was elected to Georgia's other Senate seat.

> **D.  The Georgia General Assembly passed S.B. 202 immediately following historic Black voter participation in the General Election and Runoff Elections, and with little regard for the ideals of an open democracy.**

150.   In response to record election participation, the Georgia General

Assembly passed S.B. 202, only 79 days after the Runoff Elections.  S.B. 202

placed restrictions on many of the safe and secure options by which Black voters,

voters of color, immigrant voters, poor voters, student voters, and voters with

disabilities exercised their right to vote.

> **1.  *S.B. 202 was passed in a hostile, racially charged environment following the General Election and Runoff Elections***

151.   S.B. 202 was passed against the backdrop of a racially charged

environment created by misinformation and conspiracy theories spread during the

2020 campaign and in the weeks following Election Day.  In the months leading up

to the General Election, election officials in multiple states raised concerns about

deliberate misinformation efforts targeting minority—and in particular—Black

voters.  A robocall targeted Black voters in Detroit "using racially charged-

stereotypes and false information to deter voting by mail," according to Michigan's

Secretary of State.  On social media, Black and Latinx voters were reportedly

flooded with ads designed to discourage them from voting altogether.

152.   Following Election Day, certain elected officials, news organizations, and campaign aides and lawyers levied unfounded claims of voter fraud, as dozens of lawsuits were filed to invalidate hundreds of thousands of ballots cast in cities with large Black voter populations like Milwaukee, Philadelphia, Detroit, and Atlanta.

153.   In Georgia, allegations targeting the integrity of the election included groundless, false assertions that voting machines "switched" votes, that voter signatures were not adequately verified on absentee ballots, that "suitcases" full of fake ballots were counted in the final tally, that ineligible voters participated in the election, and that the identities of deceased individuals were used to cast votes.

154.   Georgia's election officials repeatedly addressed and debunked these claims of voter fraud.  Secretary Raffensperger described Georgia's elections as "secure, reliable and efficient," and specifically called Georgia's minimum requirement of 16 days of early voting as the country's "gold standard."  Other Georgia election officials warned that the conspiracy theories about the General Election could suppress voter turnout for the Runoff Elections.  Lieutenant Governor Geoff Duncan pushed back against misinformation about the election, stating that his office had not "seen any sort of credible examples" of systemic voter fraud or irregularities.  Governor Brian Kemp and Lieutenant Governor Duncan also rebuffed calls by state legislators for a special session of the General

Assembly in December 2020 to subvert the will of the voters by selecting a separate slate of presidential electors.

155.   In post-election litigation, state and federal judges rejected at least four lawsuits challenging Georgia's election results based on dubious claims of voter fraud.  By mid-December, dozens of state and federal judges across the country rejected post-election lawsuits challenging the results of the General Election.

156.   In the wake of the General Election, legislatures across the country sought to restrict voting access in yet another attempt to suppress Black turnout and disenfranchise Black voters.  According to a report from the NYU School of Law's Brennan Center for Justice, in the first 50 days of 2021, state legislators in 43 states filed over 250 bills that would restrict voting access—seven times as many restrictive voting laws as proposed during the same period in 2020.

157.   In Georgia, the effort to restrict voting access began as soon as the last election ended.  On January 5, 2021, Georgia held the Runoff Elections to fill its two U.S. Senate seats, and Jon Ossoff and Raphael Warnock were declared the projected winners the next day.  In the early hours of January 7, 2021, the U.S. Congress certified President Joe Biden and Vice President Kamala Harris, the first Black and Asian-American Vice President, as the winners of the General Election after the process was delayed by a violent mob of rioters who stormed the U.S. Capitol.  Later that day, Georgia House Speaker David Ralston announced that he

would form a Special Committee on Election Integrity.  Representative Barry Fleming serves as the Chair of the 14-member Special Committee, and Representative Alan Powell serves as its vice-chair.

158.   At the start of the legislative session, the Chair of the Gwinnett County Elections Board indicated why she wanted the Georgia General Assembly to impose new restrictions on voting: "They don't have to change all of them, but they've got to change the major parts of them so that we at least have a shot at winning."  The U.S. Supreme Court has warned that measures designed to harm racial minority voters for political interests can run afoul of the federal Constitution.  *See, e.g.*, *Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 914 (1995)).

159.   Georgia House Speaker David Ralston stated that he does not want every registered voter to receive an absentee ballot because it would "certainly drive up turnout."  He also has baselessly invoked concerns about voter fraud and election fraud as reasons why vote-by-mail should not be acceptable.

       2.      ***The Georgia General Assembly passed S.B. 202 with little process or regard for the ideals of an open democracy***

160.   The legislative committees tasked with assessing elections bills did not provide open, transparent, or inclusive practices for public testimony.  Neither the Senate Committee on Ethics ("Senate Committee") nor the House Special Committee on Election Integrity ("House Committee") announced clear guidelines for providing and receiving public input before any hearings.  For example, basic

information about who could testify, how to sign up for testimony, or how testimony would be conducted was not provided in advance of hearings.

161.   When guidance was provided about public testimony, it was often inconsistent.  For example, prior to a February 19, 2021 House Committee hearing, the House Committee indicated to members of the public that remote testimony via videoconferencing technology would not be available.  But during the hearing, Chair Fleming invited certain witnesses to testify remotely.  Only in response to a question during the hearing did Chair Fleming indicate publicly for the first time that remote public testimony would be available.  However, this opportunity was only offered to members of the public who were specially invited by House Committee members or staff to testify.

162.   On some occasions, witnesses were denied the opportunity to testify despite repeatedly filing written requests to testify.  For example, the NAACP Legal Defense & Educational Fund ("LDF"), counsel for Plaintiffs, was unable to testify at two House Committee hearings held on February 22 and 23, 2021, despite formally requesting an opportunity to testify on multiple occasions beforehand.  Despite this, Chair Fleming inaccurately proclaimed at the end of the February 23, 2021 hearing that everyone who signed up to testify had been afforded an opportunity to do so.

163.   Members of the disability-rights community were often shut out of the legislative process entirely.  Gaylon Tootle, the First Vice President for the

National Federation of the Blind-Georgia and a Black resident of Georgia with a visual impairment, attempted to testify multiple times at hearings on elections bills about the impact of proposed changes on voters with disabilities but was denied each time.

164.   Updated versions of the bill were almost never uploaded to the General Assembly website in a timely manner.  Many committee hearings on elections bills took place even though the version of the bill being discussed had not been uploaded online for the public's consideration.  This made it impossible for legislators and members of the public to meaningfully offer comments and engage with the substance of elections bills.  For example, during a February 25, 2021 Senate Committee hearing, Senate Committee Chair Max Burns announced that a substitute version of an elections bill incorporating a significant set of amendments would be provided by the next day.  Doing so was particularly important, he explained, because members should have an opportunity to review the amended text before the next Senate Committee meeting on March 1, 2021.  However, a substitute version of the bill was never provided the following day, nor at any time prior to the meeting to consider the amendments.  Instead, the final amendments were only publicly disclosed and discussed for the first time during the March 1, 2021 meeting.  One senator even complained at the March 1, 2021 meeting that it was her first time reading the proposed changes.  That same day, the

Senate Committee held a vote on an amended version of the same bill, which was then sent to the Senate floor.

165.   In the House Committee, when Chair Fleming was challenged about the lack of transparency in the legislative process at a hearing held on March 18, 2021, he responded that his office was willing to send a copy of an updated bill to anyone who asked for it.  This would require a member of the public to follow all hearings, know that there was a change in a bill, know from watching the March 18, 2021 hearing that one could request a copy of the bill, and have the time and knowledge to reach out to a legislative staffer to request a copy of the bill.

166.   Lengthy bills were often provided to the public with little or no time to read them, much less analyze them, before the House and Senate Committees convened hearings on them.  For example, the original version of House Bill 531 ("H.B. 531"), provisions of which were incorporated into the final version of S.B. 202, was only made available through postings on social media mere hours before members of the House Committee convened for a hearing on February 18, 2021. Then, less than 24 hours later, the House Committee held another hearing before all its members at 9:30 a.m. the following day.  The House Committee continued to amend H.B. 531 and hold hearings on amended versions of the bill without making amendments or substitute versions publicly available.

167.   Many committee hearings related to elections bills were scheduled and held with little to no advance notice.  Some of these hearings were not even

live-streamed for the public to participate.  Often, testimony was limited only to those members of the public who could attend these hearings in-person.  This requirement was often enforced even as the COVID-19 pandemic was ravaging the state.

168.   The Senate Committee held numerous hearings early in the morning at either 7:00 a.m. or 7:30 a.m., including on February 25, 2021.  The scheduling of these hearings, ninety minutes before the start of traditional business hours, appeared calculated to avoid scrutiny and exclude members of the public.

169.   Although concerns were raised by members of the public about the potential racial impact of proposed elections changes during House and Senate Committee hearings, it appears that no analysis was ever conducted by the Committees to evaluate the racial impact of any of the elections bills considered or passed by the General Assembly.

170.   On March 8, 2021, the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections issued a statement stating it was "concerned that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."

171.   S.B. 202 was rushed through the legislative process.  After the Georgia House of Representatives passed a substituted version of S.B. 202 on March 25, 2021, it was immediately transmitted to the Georgia Senate.  No conference committee was convened.  The bill was brought to the floor of the

Senate for a vote mere hours later.  Prior to the vote in the Senate, State Senator Elena Parent requested that the fiscal impact of the bill be determined before passage.  Within minutes, Lieutenant Governor Duncan denied this request and ruled that no fiscal determination needed to be made because S.B. 202 would not exceed $5 million in its fiscal impact.  No evidence was provided whatsoever to support this on-the-spot determination.

172.  S.B. 202 was rushed into being signed into law with little time for the public to weigh in.  Mere hours after the House and Senate voted on the now 96-page version of S.B. 202, Governor Brian Kemp signed the bill into law in a closed-door signing ceremony.  During the time between passage of S.B. 202 in the General Assembly and when the Governor signed the bill into law, the Governor's office did not accept any messages by phone, including messages encouraging him to veto the bill.

173.  Even legislators were forcibly shut out of the process of the Governor signing S.B. 202 into law.  Representative Park Cannon was arrested and forcibly removed from the State Capitol when she knocked on the Governor's office door, requesting that the public be allowed to witness the announcement of the bill signing that was under way.

**E.   Provisions of S.B. 202 place limitations on opportunities for voters to exercise their right to vote.**

**1.   *Sections 20 & 26, mobile voting unit restrictions***

174.   Prior to the enactment of S.B. 202, Georgia law permitted county election administrators to procure and provide portable or movable polling facilities, also known as "mobile voting units," as supplemental polling locations during the advance voting period and on Election Day.

175.   In the 2020 election cycle, these mobile voting units were deployed to mitigate the shortage of accessible and secure polling locations that resulted in long lines of voters at existing and traditional polling locations.  Fulton County, for instance, purchased two mobile voting units which made stops at twenty-four different locations, including several Black churches, during the advance voting period ahead of the General Election.

176.   Despite the absence of any facts to indicate the mobile voting units used in the 2020 election cycle were not secure, caused confusion, or generated any other voter access or election administration issues, Section 20 of S.B. 202 restricts the use of mobile voting units to situations where an emergency is declared by the Governor.  Such an emergency declaration may only occur under a narrow set of conditions and only after particular procedures are taken, including a convening of a special session of the General Assembly.  O.C.G.A. § 38-3-51.  Relatedly, Section 26 of S.B. 202 additionally restricts the use of mobile voting units to supplement existing polling locations during the advance voting period.

2.      ***Section 25, new identification requirements and timing parameters for requesting an absentee ballot***

177.    Georgia has relied on vote-by-mail procedures for decades.  Prior to S.B. 202's enactment, a voter could request an absentee ballot by providing certain information, such as the current address at which they are registered to vote and the voter's signature or the signature of the eligible relative requesting the ballot on behalf of the voter, and the signature of the person providing assistance to the voter, if applicable.  Additionally, before S.B. 202, voters could request an absentee ballot 180 days prior to an election through the Friday prior to the election.

178.    Section 25 of S.B. 202 now requires, in addition to the voter's registration address and date of birth, that the voter provide their Georgia's driver's license or Georgia state identification card number.  S.B. 202 further demands that a voter who does not have a Georgia driver's license or state ID card instead provide a photocopy or electronic image of a utility bill, bank statement, government check, paycheck, or other government document containing the name and address of the voter.

179.    Section 25 of S.B. 202 still requires that the voter or a relative assisting or requesting the absentee ballot sign the absentee ballot application with "his or her usual signature."

180.    Section 25 of S.B. 202 also delays and compresses the time period during which a voter may request an absentee ballot.  Unless a voter is

hospitalized, S.B. 202 § 27, S.B. 202 reduces the time a voter can request an absentee ballot to seventy-eight days prior to an election and requires that the application be received by the county election administrator eleven days prior to the election, S.B. 202 § 25.

181.   Proponents of S.B. 202 have failed to identify or offer any concrete facts to support a security justification for creating additional, onerous ID Requirements to request an absentee ballot or for reducing the timing and duration for requesting an absentee ballot.  According to multiple statements by Governor Kemp, Lieutenant Governor Duncan, Secretary of State Raffensperger, and Georgia Voting Systems Manager Gabriel Sterling, there was no evidence of widespread vote-by-mail fraud in Georgia, nor has there ever been.

> **3.    Sections 27 & 28, new identification requirements for casting an absentee ballot**

182.   Under Section 27 of S.B. 202, a voter must now provide additional personal ID information on the outside of the absentee ballot mailing envelope to complete their absentee ballot submission.  This information includes a Georgia driver's license number or Georgia state ID card number, the voter's date of birth, and the last four digits of the voter's social security number if the voter does not possess a Georgia driver's license or state ID card.

183.   According to Section 28 of S.B. 202, if the voter does not possess a Georgia driver's license, state ID card, or social security number, a photocopy of a utility bill, bank statement, government check, paycheck, or other government

document containing the name and address of the voter must accompany the voter's returned absentee ballot.

184.   The voter must additionally sign an oath in their "usual signature" swearing, under criminal penalty, that they have completed their ballot in secret, even from observation by the voter's child under 18 years of age or any child under 12 years of age.  S.B. 202 § 27.

185.   Proponents of S.B. 202 have failed to identify or offer any concrete facts to support a security justification for creating additional, onerous ID Requirements to submit an absentee ballot.  According to multiple statements by Governor Kemp, Lieutenant Governor Duncan, Secretary of State Raffensperger, and Georgia Voting Systems Manager Gabriel Sterling, there was no evidence of widespread vote-by-mail fraud in Georgia, nor has there ever been.

### 4.   *Section 26, secure drop box limitations*

186.   Before S.B. 202's enactment, Georgia voters enjoyed the ability to safely and securely cast their ballot by drop box in one of the existing 330 drop boxes in Georgia, many of which were freestanding outside of a building.

187.   Before S.B. 202, many county election administrators chose to exercise their discretion to keep drop boxes open after business hours and beyond the advance voting period and up until the polls closed at 7:00 p.m. on Election Day.

188.   In the 2020 election cycle, counties were required to monitor each drop box through 24/7 video surveillance to ensure security of drop box voting.

189.   The statewide use of drop boxes in the 2020 election cycle provided the flexibility necessary to ensure voters had meaningful access to secure drop boxes, and minimized crowding and alleviated the risk of long lines during in-person voting, as well as voter concerns with mail delivery.  Drop boxes were and continue to be necessary to providing equitable voting options.

190.   First, Section 26 of S.B. 202 curtails the availability of drop boxes to the lesser of one per every 100,000 "active registered voters" in the county or one per advance voting location in the county.  This drastically reduces the number of drop boxes available in the most populous counties, but also in smaller counties. For instance, voters in Richmond County would go from having five drop boxes (with the option for more) to having only one.

191.   Second, S.B. 202 requires drop boxes to be established inside of the office of the board of registrars or absentee ballot clerk or inside of an advance voting location.  Only during Governor-declared emergencies are drop boxes permitted to be located outside.

192.   Third, S.B. 202 limits the hours in which a drop box is available to the hours of operation of that office or advance voting location.

193.   Fourth, S.B. 202 replaces the 24/7 surveillance requirement with a mandate that all drop boxes be under constant surveillance by an election official, law enforcement officer, or licensed security guard.

### 5.   *Section 28, runoff early voting restriction*

194.   S.B. 202 forces all runoff elections to take place 28 days after the general or primary election and Section 28 of S.B. 202 drastically reduces the advance voting period for runoffs from three weeks to one week, with no mandatory weekend voting days, including Sunday voting.

### 6.   *Section 33, Line Warming ban*

195.   Section 33 of S.B. 202 criminalizes volunteers who provide free food and water, as well as other practices and materials associated with line warming, to voters standing within 150 feet of the outer edge of a polling place.

196.   Because S.B. 202 would also prohibit a volunteer from coming within 25 feet of any voter standing in line, even outside of the 150-foot zone, the reach of such a buffer zone stands to be hundreds of feet in distance from the polling place entrance.

197.   It appears that no evidence was provided during the House or Senate Committee hearings to justify criminalizing the provision of free food and water to voters standing in line.  Although generalized concerns were raised regarding the theoretical possibility for such activities to make vote-buying and solicitation easier, no specific instances of these types of infractions were ever cited.

### 7.   *Sections 34 & 35, out-of-precinct provisional ballot*

198.   Prior to S.B. 202, if an otherwise eligible voter casts a provisional ballot in the county in which they reside but at a different precinct than the one assigned to them ("out-of-precinct"), their ballot would be counted for every race on that ballot in which the voter was qualified to vote.

199.   Over 11,000 voters cast a provisional ballot in the General Election and over 10,000 voters cast a provisional ballot in the Runoff Elections.  Most of these provisional ballots comprised out-of-precinct ballots.

200.   Sections 34 and 35 of S.B. 202 disenfranchise all out-of-precinct provisional ballot voters who cast a ballot before 5:00 p.m. on Election Day. Rather than count their votes for all of the races to which the voter was qualified and otherwise eligible to vote on that precinct's provisional ballot, S.B. 202 requires poll officials to inform such person that their vote is invalidated for all of the races on that ballot.

### F.   S.B. 202 burdens Black voters, other voters of color, and other historically disenfranchised communities—and it does so for no other purpose than to limit their opportunities to vote.

201.   The challenged provisions of the S.B. 202 independently and cumulatively establish obstacles that severely burden or outright deny Plaintiff and Plaintiff members' right to vote.  The restrictions have a pronounced disparate impact upon voters from historically disenfranchised communities—a result so clear that it can only be intentional.  These historically disenfranchised

communities disproportionately lack the requisite ID or access to getting them, require access to ballot drop boxes, and experience unacceptably long waits for in-person voting.  The changes that specifically eliminated the guarantee of early voting on weekends for runoff elections, a practice used disproportionately by Black voters and other voters of color, portends especially acute burdens upon these populations.  S.B. 202 systemically and intentionally targets these populations with onerous burdens, evidently to suppress their votes, because there is no fact-based justification for the changes.

202.   Proponents of these measures failed to present any evidence that the restrictions in S.B. 202 were necessary to address concerns of fraud.  The Presidential Commission on Election Administration, a bipartisan commission of experts, discouraged the restriction of advance voting opportunities, and affirmatively encouraged its expansion, to improve voters' experiences with voting and promote confidence in election administration across the country.  According to the Commission, "[s]tated simply, early voting offers Americans opportunities to participate in the electoral process that simply cannot be afforded by the [typically] contained twelve-hour period of the traditional Election Day."

203.   The Georgia General Assembly nevertheless restricted those opportunities without any rational basis and despite having been presented with voluminous testimony and evidence that the restrictions would severely and

measurably burden Georgia citizens' right to vote, and in particular Georgians of color.

1.    *Elimination of mobile voting units imposes a disparate burden*

204.   The elimination of all mobile voting units except at Defendant Governor Kemp's discretion in the event of "emergencies" unduly and especially burdens voters of color.  Mobile voting units consist of buses specially outfitted to provide four to eight additional, secure voting stations.  In the General Election, these mobile voting units were used within Fulton County, where the majority of the population is nonwhite, to provide accessible voting.  Fulton County's own website notes that "the County's new Mobile Voting Unit is an accessible voting unit that will create a simple, secure voting experience for voters of all ages and voters with disabilities."  The most populous county in Georgia, Fulton—along with the other Atlanta metro area counties—has an established history of long voting lines and backlogs of absentee ballot requests.  Indeed these impediments to voting during the June 2020 primary led Fulton County to double its budget for elections, secure grants, and procure the two mobile voting units that were used in the General Election.  The efforts by Fulton County were successful and posed no election security risks.  The General Election saw the largest voter turnout in 28 years, with an overall turnout rate of 77.92%.  With the historic voter turnout in the General Election, which Georgia's election officials have universally confirmed was secure and accurate, it is clear that these mobile voting units contributed to the

ability of Fulton County voters who would otherwise not have been able to vote, to cast their votes.  Eliminating them, pursuant to S.B. 202, will burden the majority nonwhite citizens of Fulton County that relied on these Mobile Voting Units to participate in the General Election.

### 2.  *Additional requirements for absentee voting impose a disparate burden*

205.   The ID Requirements provisions of S.B. 202 for both requesting and casting an absentee ballot impose a severe burden on Georgia voters, and most acutely voters of color.  Absentee voting has been critical to ensuring that voters have equitable and safe access to the ballot box, and the addition of the ID Requirements for absentee voting will dramatically limit absentee ballot access by imposing discriminatory and unnecessary burdens on or barriers to voting for voters who do not have one of a few limited forms of acceptable ID.  Moreover, voters who lack access to printers, scanners, copiers, or the internet would find it difficult if not impossible to comply with this absentee voting requirement.

206.   These harms will not be borne equally among different voting populations.  Instead, they will fall disproportionately on people of color, the elderly, people with disabilities, poor people, rural residents, and students—all populations who face heightened challenges accessing DMV offices, photocopiers, and the ability to pay for photocopies, or a polling place to vote in-person.  For instance, approximately 16.6% of Georgia's voting-age citizens who lack access to a vehicle live more than 10 miles from a state office that issues ID.  Almost all of

these citizens live in rural areas where public transportation is unavailable. These areas also house high concentrations of people of color and people living in poverty. In Georgia's "Black Belt," there are 21 contiguous and predominantly Black rural counties where all State driver's license offices are open two days per week or fewer. The same populations would face similar challenges in accessing a photocopier to copy their ID, which S.B. 202 would require of voters without a driver's license or state ID. For the elderly, people with disabilities, students, and others who cannot physically cast a ballot in-person and therefore rely on vote-by-mail, the burden of the ID Requirements on the right to vote is particularly acute.

207. Moreover, the ID Requirements would exacerbate existing racial disparities in absentee ballot rejections. As it stands, without these additional requirements that Black and other voters of color will be disproportionately unable or burdened to satisfy, there are well-documented and long-standing racial disparities in absentee ballot rejections in Georgia. Data from recent elections reported by the Brennan Center for Justice reflects that racial disparities continue, which is consistent with previous literature.

208. Such exacerbating factors and their impact on people of color and other historically disenfranchised communities have led stringent ID Requirements adopted by other states to be invalidated as violating the U.S. Constitution, Section 2 of the VRA, or both.

209.   The General Election and Runoff Elections featured historically high use fueled by broad reliance upon absentee voting.  Data from these elections show that nonwhite voters used mail-in voting at unprecedented rates even higher than white voters.  For example, nearly 30% of Black voters voted by mail in the 2020 General Election, compared to 24% of white voters.

210.   In the absence of any recorded or statistically significant evidence of absentee voter fraud in Georgia—an Arizona State University study found just eight isolated instances of alleged absentee voter fraud in Georgia that actually resulted in a plea or consent order between 2000 and 2012, a rate of less than 0.00003% during the covered time period, and dozens of state and federal courts, as well as state election officials, reaffirmed the absence of voter fraud in the aftermath of Georgia's General Election—there is simply no sufficiently weighty justification, let alone a rational or compelling need, for imposing the onerous ID Requirements on absentee ballot voters that will disproportionately burden minority, poor, the elderly, rural populations, voters with disabilities, and student voters.  Moreover, these ID Requirements pose security risks to voters, particularly to immigrant voters and voters of color who are vulnerable to identity theft scams based on their need for additional language and other assistance to complete forms.

3.   ***Restrictions on distribution of absentee ballots impose a disparate burden or complete barrier to voting***

211.   Data from recent years demonstrates that while Black voters comprise 30% of Georgia's voting population, these voters account for almost 42% of the

request for absentee ballots.  Per the Georgia Secretary of State's own data, Black voters are more likely to vote by mail than any other racial demographic.  Other communities, including immigrant, poor, elderly, and student voters, have likewise relied disproportionately on absentee voting, particularly during the General Election and Runoff Elections.  For instance, immigrant voters and voters with disabilities who often need translation services or other assistance to complete a ballot often prefer to vote by mail so they have more time to complete their ballot.

212.   Because S.B. 202 will severely restrict access to absentee ballots, including by explicitly restricting their distribution by state and local officials and voter outreach organizations, the severe burdens imposed by the law will disparately impact these voters, including by forcing them to vote more heavily in-person when in-person voting may not be a tenable option, and under circumstances where in-person voting involves overcoming additional burdens that result from long lines, grueling waits, and greater risks of having one's ballot rejected.

4.   ***Restrictions on drop boxes impose a disparate burden or barrier to voting***

213.   S.B. 202's extreme restrictions on the location, availability, and operating hours of ballot drop boxes will disproportionately burden Black, Asian, and Latinx voters, and voters with disabilities.  Georgia voters—especially in these historically disenfranchised communities—have come to rely on drop boxes as a safe and an important option for casting a ballot.  For many voters—especially

those with childcare or strict (and/or unpredictable) work commitments that limit their availability during normal voting hours, as well as those with medical conditions or other disabilities—casting an in-person ballot during advance voting or on Election Day may be an untenable option.  In addition, widely reported and continuing failures at the United States Postal Service have raised justifiable concerns about mail-in voting as a reliable method to cast a ballot.  For these voters, secure drop boxes provide a reliable and accessible option, and the enacted restrictions severely burden their rights to vote by forcing them to navigate more onerous paths to voting, if they are able to vote at all.

214.   The new mandate for in-person "constant surveillance" of secure drop boxes by an election official, licensed security guard, or law enforcement official, will also pose serious voter intimidation concerns for Black voters and other voters of color routinely and unfairly targeted by law enforcement.  Without any evidence that (potentially armed) law enforcement surveillance is necessary to repel fraud or misconduct, the needless surveillance enacted by S.B. 202 recalls past practices of Jim Crow era voter intimidation deployed to deter Black voters in particular from casting a ballot.  The new restrictions on drop boxes raise all of the same threats and burdens, and inure most heavily and disparately upon communities of color, and do not increase the security of Georgia elections.

5.  ***Allowing citizens to file unlimited challenges to voters' registrations and voting rights imposes a disparate burden***

215.   S.B. 202 enacts another form of burdensome intimidation by subjecting Georgia voters to the risk of having to defend their vote against an unlimited number of public challenges by any person who wishes to disenfranchise them, with or without merit.

216.   Historically and into the present, baseless accusations of voter fraud have been used against Black voters and other voters of color to deter them from exercising their right to vote.  By needlessly exposing voters—and again, most acutely voters of color and poor voters—to a process that requires them to expend additional time and resources after casting a ballot to rebut abusive and potentially duplicative, frivolous, and unlimited challenges to their eligibility before a government review board, S.B. 202 places an additional critical burden on the right to vote that is also disparately felt by Plaintiffs, their members, as well as the communities they live in, represent, and serve.  Because S.B. 202 codifies the right to bring unlimited challenges without any standards of what constitutes probable cause, the potential for abuse and conversely for harm to individual voters, is, by definition, unlimited.

217.   There is no legitimate state interest that justifies these severe burdens. State authorization to bring an unlimited number of voter challenges only operates to enable serial vote suppressors to identify and harass voters, and particularly voters of color, based on racist and xenophobic tropes about "suspicious" voter

conduct that have no basis in observed reality.  It is hard to conceive of a practice more susceptible to abuse without any redeeming legitimate state interest.

### 6.   *Prohibiting provisional ballots cast in the wrong precinct imposes a disparate burden*

218.   S.B. 202 also outright *disenfranchises* otherwise eligible Georgia voters who cast ballots in the wrong precinct—the most severe burden that there is. Under the new law, Georgia election officials will discard the entire ballot cast in the incorrect precinct, regardless of whether the ballot contains eligible votes.  For example, while local races on a ballot may be precinct-specific, it is undisputed that ballots similarly contain congressional and federal races which are not precinct-specific.  Yet rather than counting the ballot's votes for eligible races as was done in the past, S.B. 202 will *require* the entire ballot to be thrown away— even if it was cast by an eligible registered voter, and even if it was cast in a timely manner and otherwise qualified to be counted—disenfranchising voters from participating in elections in which they have a right to vote in.

219.   This new practice will disproportionately affect Black voters, and other historically disenfranchised communities, who are proven to be more likely than white voters to cast an out-of-precinct ballot since they are more likely to have moved within their county than white voters, and thus more likely to arrive at an incorrect precinct.  Recent research specifically demonstrates that Black voters in Georgia disproportionately live in neighborhoods with much higher rates of in-county moves.  Not only does the data reflect that the population with the most in-

county moves is 47% Black, relative to 37% non-Hispanic white, but the population with the *least* in-county moves is only 22% Black, compared to 64% non-Hispanic white.  Requiring election officials to discard ballots cast in the wrong precinct will thus not only disenfranchise a substantial number of Georgia voters each year, but it will do so disproportionately within Georgia's Black community, as well as other similarly situated immigrant, minority, student, and poor populations prone to the same pressures that require regular relocation.

7.    ***The early voting runoff restrictions impose a disparate burden***

220.    S.B. 202 dramatically reduces both the timeframe for runoff elections and the early voting period available during those elections, including by eliminating the guarantee of an opportunity to vote early on the weekend. Advance voting opportunities and particularly weekend voting opportunities are essential to ensuring voters can safely, securely, and freely participate in our democracy.  They are important mechanisms that give voters the option to cast their ballots without facing the crowds and long lines on Election Day, as well as the flexibility to balance family and work obligations that make voting on Election Day untenable for thousands of Georgians.

221.    Eliminating opportunities to vote early imposes direct and secondary burdens upon Georgians' right to vote, including those that vote on Election Day. Most directly, restricting the early vote period forces voters who need to vote early to do so on fewer days.  This restriction functionally prevents some voters from

voting altogether.  And even for those who do vote early anyway, the restriction has the secondary effect of adding to the long lines and wait times at the early voting polls on those fewer days, which has the effect of deterring, burdening, and in some cases functionally eliminating those voters' right to vote.  The same secondary effects flow through to Election Day, where some voters who prefer but do not need to vote early are pushed due to overcrowding during the early vote period.  Simply put, the fewer days available to vote, the more onerous voting becomes.

8. *Criminalizing line warming activities imposes a disparate burden*

222.   In addition to curbing voters' opportunities to vote absentee, at mobile voting units, or during early voting, S.B. 202 also imposes *criminal liability* on any volunteer who offers food or water to voters standing in long lines at in-person polling places—oftentimes for hours—to vote.

223.   This burden is most severely felt by Black voters and other voters of color, who disproportionately experience significantly longer wait times and longer lines during in-person voting.  The line waits experienced in majority non-white precincts of Georgia are staggering.  During early voting for the General Election in Gwinnett County, for example, early voting lines began forming at 4:00 a.m., three hours prior to the opening of polls, and during midday reported wait times of five to eight hours.  Six of Gwinnett's seven most congested polling places serve

predominantly nonwhite neighborhoods.  This is not an isolated incident, but in fact a regular occurrence across the state.

9. ***The cumulative effects of these burdensome provisions in S.B. 202 will be to make lines longer for Black voters and other communities of color***

224.   As S.B. 202 itself acknowledges, in-person voting in Georgia is plagued by "long-term problems of lines."  S.B. 202 § 2(7).  According to the Bipartisan Policy Center, in 2018, Georgia had the single longest average wait time to vote out of all fifty states.  Long lines are corrosive to democracy.  These lines force voters to choose between their health, their time, or their job and exercising their fundamental right to cast a ballot. A long line to vote does not just discourage people from casting a ballot that day: it also discourages them from voting in the future.  Statistical evidence shows nearly 200,000 people failed to vote in the 2014 elections due to long lines in 2012.

225.   Defendants' structuring of Georgia's elections helps create these lines. More than half of Georgia's 2,655 precincts are assigned more than 2,000 voters, the recommended maximum.  In rural counties, over 22,000 voters can be assigned to a single polling place.  The average polling place serves over three thousand voters, 47% more than they did in 2012, and far more than the recommended number.

226.   The burdens of these lines do not fall evenly on Georgia voters.  As one national study found, "the more voters in a precinct who are non-white, the longer the wait times."

227.   Georgia is no exception: at polling places that were 10% or less white, the average waiting time was 51 minutes.  At polling places that were 90% white, the average waiting time was six minutes.  Even though only one-third of Georgia's polling places are in majority Black neighborhoods, in the June 2020 primary election, two-thirds of the polling places that had to be kept open late to accommodate voters waiting in line were in majority Black neighborhoods.

228.   Since 2012, almost two million people have registered to vote in Georgia, making up more than a quarter of total active registered voters in 2020. Many of these new voters are younger, nonwhite, and based in the nine counties making up metropolitan Atlanta.  In the same period, rather than accommodating this increase by establishing sufficient polling locations to serve them, the state has cut polling locations by nearly 10%.  Although the cuts happened across neighborhoods, the surge in registration in majority Black precincts means they disproportionately harm those voters.

229.   In the June 2020 primary elections, hundreds of voters were forced to choose: wait in line for hours, with temperatures pushing 90 degrees, or sacrifice their right to vote.  According to an Atlanta-Journal-Constitution analysis, Black voters bore the brunt of these long lines: only 61% of majority Black precincts

close on time compared with 80% of mostly white precincts.  Whether a precinct

closes on time indicates whether there was a line of voters still waiting to cast their

ballots.  Some voters in Union City, Fulton County, which is 88% Black, waited in

line until 12:37 a.m. to vote.

230.   Voters and journalists documented hundreds of voters waiting in the

rain and hot sun in lines extending as far as the eye can see, telling a compelling

story of the magnitude of the problem.  *See, e.g.*, Emma Hurt (@Emma_Hurt),

Twitter (June 9, 2020),

https://twitter.com/Emma_Hurt/status/1270500551487295488.



231.   Long lines were a feature of the General Election in Georgia as well,

with wait times of five hours common in metro Atlanta and some voters waiting

over 11 hours.

232.   Because state officials allow these lines to occur year after year, Plaintiffs AME Church and WWA step up to help affected voters, who are predominantly Black voters in Georgia condemned to wait in these long lines, overcome the burdens those lines impose upon their exercise of the right to vote. They engage in what is sometimes called "line warming," when volunteers provide voters water, snacks, chairs, and other assistance to voters waiting in line to vote.

233.   Volunteers, who are generally parishioners for Plaintiff AME Church, staff these efforts, offering water bottles and snacks to voters waiting in line. For example, during the lunchtime rush, when the polling site is busiest and the weather is hottest, Plaintiff AME Church's volunteers will offer people water bottles out of coolers. As they do so, they encourage people verbally to stay in line and answer questions about the process.

234.   Providing voters with the supplies they need encourages them to stay in line, reminds them of the importance of casting a ballot, and affirms their value as a person and a voter. Line warmers create a sense of community, reminding voters that voting is a joyful thing and a civic responsibility. For Plaintiff AME Church, providing support to voters in line is critical to their speech, including conveying the message of the importance of staying in line, the importance of voting, underscoring each person's value, and living up to the tenets of the Gospel: "For I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink." Matthew 25:35 (NIV). Additionally, Plaintiff AME

Church believes that line warming helps reaffirm the dignity of Black voters, who are disproportionately affected by longer lines, and who should not be forced to wait in long lines without necessities like food and water.

235.   Because many member churches of Plaintiff AME Church serve as polling sites, those are frequently the sites of line warming activity for Plaintiff. These activities are deeply tied with the mission of AME Church and, in addition to members' private contributions, it uses its food pantry inventory to support these activities.

236.   Voters overwhelmingly thank Plaintiffs for these efforts.

237.   This law targets this practice with criminal penalties.  It bans "giv[ing], offer[ing] to give, or participat[ing] in the giving of … gifts, including, but not limited to, food and drink," to any voter standing in line at a polling place. Ga. Code Ann. § 21-2-414(a).

238.   In the lead-up to the Runoff Elections, Defendant Raffensperger sent an Official Election Bulletin aimed at suppressing line warming activities via enforcement of the State's ban on buying votes, Ga. Code Ann. § 21-2-570.  This bill now modifies the State's provisions on electioneering.

239.   But Plaintiffs are not bribing voters and they are not electioneering. Line warming is not partisan: AME Church gives all voters, regardless of how they plan to cast their ballot, their encouragement and support.  AME Church does not ask folks for whom they are voting, and indeed gives out their supplies to all voters

without knowing what candidates any given voter intends to support.  Their message is not to stay in line for a particular cause or candidate, nor is it to offer a bribe to take a certain action.

240.   Instead, it is merely to encourage people to vote and remind people how precious that right is.  In doing so, they try to remedy a situation caused in part by Defendants.  Plaintiffs go to the polling sites with the longest lines and support whatever voters they find there.  Their activities facilitate, rather than hinder, the free exercise of voters' rights.

241.   The State's ban on these activities will thus not only result in the arrests of Black clergymen and lay leaders, it will materially aggravate the already severe burdens inflicted by this legislation specifically, especially, and disparately upon Black voters, and other poor voters of color from similarly situated communities, who rely on "line warming" to make it through interminable delays to cast a ballot.

## <u>FIRST CLAIM FOR RELIEF</u>
### Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. §10301, *et seq.*
### (Intentional Racial Discrimination & Discriminatory Results)

242.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

243.   Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits voting laws, policies, or practices that "result[] in a denial or abridgement

of the right of any citizen of the United States to vote on account of race or color[.]"

244.   In violation of the rights of members of Plaintiffs AME Church and the Deltas to vote free from racial discrimination, and the rights of all Plaintiffs to not be burdened with the expenditure and diversion of limited organizational resources to address discriminatory restrictions on the right to vote, S.B. 202 (1) adopts and/or operates bans on mobile voting units for advance voting and election day other than "used in emergencies declared by the Governor pursuant to Code Section 38-3-51 to supplement the capacity of the polling place where the emergency circumstance occurred"; (2) imposes new, restrictive ID Requirements for requesting an absentee ballot; (3) imposes new, restrictive ID Requirements for casting an absentee ballot; (4) limits access to secure drop boxes; (5) restricts the timeline for early voting during runoff elections; (6) prohibits providing free food and water or other assistance or line warming; and (7) disenfranchises eligible voters who cast out-of-precinct provisional ballots.

245.   S.B. 202 violates Section 2 of the VRA because the above-listed sections were adopted for the purpose of denying voters of color full and equal access to the political process.

246.   S.B. 202 further violates Section 2 of the VRA because, given the totality of the circumstances alleged herein, the above-listed provisions, individually and cumulatively, will disproportionately deny voters of color an

equal opportunity to participate in the political process and to elect representatives of their choice by denying their right to vote. Specifically, S.B. 202 interacts with historical, socioeconomic, and other electoral conditions in Georgia to prevent voters of color, and particularly Black voters, from having an equal opportunity to participate in the political process on account of their race or color.

## SECOND CLAIM FOR RELIEF
**Fourteenth Amendment**
**U.S. Const. amend., XIV; 42 U.S.C. §1983**
**(Intentional Race Discrimination)**

247.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

248.   S.B. 202 violates the Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because it was purposefully enacted and operates to deny, abridge, or suppress the right to vote of otherwise eligible voter on account of race or color.

249.   The facts alleged herein reveals that S.B. 202 was enacted, at least in part, with a racially discriminatory intent to discriminate against Black voters and other voters of color in violation of the United States Constitution.

250.   Georgia's long history and ongoing record of racial discrimination in the context of voting, the known and reasonably foreseeable discriminatory impact of S.B. 202, the sequence of events and substantive departures from the normal legislative process which resulted in the enactment of S.B. 202, and the

tenuousness of the stated justifications for S.B. 202 raise a strong inference of a discriminatory purpose in violation of the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF
**Fifteenth Amendment**
**U.S. Const. amend., XV; 42 U.S.C. §1983**
**(Intentional Race Discrimination in Voting)**

251.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

252.   Section 1 of the Fifteenth Amendment to the United States Constitution prohibits states from abridging the "right of citizens of the United States to vote . . . on account of race, color, or previous condition of servitude."

253.   S.B. 202 violates the Fifteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. § 1983, because Defendants intentionally enacted and operate the law to deny, abridge, or suppress the right to vote on account of race or color.

## FOURTH CLAIM FOR RELIEF
**First and Fourteenth Amendments**
**U.S. Const. amend. XIV; 42 U.S.C. §1983**
**(Undue Burden on the Right to Vote)**

254.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

255.   State election administration practices may not place burdens upon a plaintiff's First and Fourteenth Amendment rights to vote unless relevant and legitimate state interests of sufficient weight necessarily justify the magnitude and

character of the burdens imposed.  The more a challenged law burdens the right to vote, the more strictly must it be scrutinized.  Even slight burdens must be justified by valid state interests of sufficient weight.

256.   The challenged provisions of S.B. 202 collectively and individually impose severe and, at a minimum, significant burdens on eligible Georgia voters' right to vote, including on Plaintiffs and members of Plaintiffs' organizations.

257.   None of the burdens imposed by the challenged provisions of S.B. 202 are necessary to achieve, let alone reasonably related to, any sufficiently weighty legitimate state interest.  The burdens imposed by the challenged provisions of S.B. 202 accordingly lack any constitutionally adequate justification, and must be enjoined.

**FIFTH CLAIM FOR RELIEF**
**Freedom of Speech / Expression**
**U.S. Const. amend. I; 42 U.S.C. §1983**

258.   Plaintiffs re-allege and incorporate by reference all prior paragraphs as through fully set forth herein.

259.   This action is brought pursuant to 42 U.S.C. § 1983 to enforce Plaintiff AME Church's right under the First Amendment, as applied to the states by the Fourteenth Amendment, to engage in protected speech and expression.

260.   Plaintiff AME Church provides food, water, and other support to these voters, as part of conveying their message of the importance of staying in line, the value of each individual's vote, and their inherent value as a person.

261.   Plaintiff AME Church's line warming goes to the heart of the First Amendment.  Encouraging people to participate in the political process, despite the barriers placed in front of them, is "the type of interactive communication concerning political change that is appropriately described as 'core political speech.'"  *Meyer v. Grant*, 486 U.S. 414, 422–23 (1988).

262.   This message cannot be split out from Plaintiff AME Church's expressive conduct.  Line warmers tell people that voting is important verbally— and they prove it through their actions.  The act of line warming cannot be split away from its message of political engagement, and the First Amendment sees no difference between the two.  *See Meyer*, 486 U.S. at 424 ("The First Amendment protects [the] right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.").

263.   This law creates a criminal misdemeanor to "give, offer to give, or participate in the giving of . . . gifts, including, but not limited to, food and drink," to voters.  Ga. Code Ann. § 21-2-414(a).  These provisions apply "[w]ithin 25 feet of any voter standing in line" to vote.  *Id.*  These provisions are squarely aimed at the activities of Plaintiff AME Church and similar organizations to support voters waiting in line.

264.   These provisions unconstitutionally burden Plaintiffs' First Amendment rights of speech and expression, and are not supported by any sufficient, let alone compelling, government purpose.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

265.   Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the challenged provisions of S.B. 202 are illegal and unconstitutional as described above, in violation of Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution;

266.   Grant Plaintiffs permanent injunctive relief enjoining Defendants, their agents, employees, and those persons acting in concert with them from enforcing or giving any effect to the challenged provisions of S.B. 202, including enjoining Defendants from conducting any elections utilizing those provisions;

267.   Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by, inter alia, 42 U.S.C. § 1988 and other applicable laws; and

268.   Grant such other and further relief as may be just and equitable.

Respectfully submitted, this 29th day of March 2021.

/s/ Nancy G. Abudu
Nancy G. Abudu (Ga. Bar 001471)
*nancy.abudu@splcenter.org*
Pichaya Poy Winichakul (Ga. Bar
246858)
*poy.winichakul@splcenter.org*
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287
Decatur, Georgia 30031-1287
Telephone: (404) 521-6700
Facsimile: (404) 221-5857


/s/ Sean J. Young
Sean J. Young (Ga. Bar 790399)
*syoung@acluga.org*
Rahul Garabadu (Ga. Bar 553777)
*rgarabadu@acluga.org*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, Georgia 30357
Telephone: (678) 981-5295
Facsimile: (770) 303-0060


/s/ Sophia Lin Lakin
Sophia Lin Lakin*
*slakin@aclu.org*
Theresa J. Lee*
*tlee@aclu.org*
Dale E. Ho*
*dho@aclu.org*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
Telephone: (212) 519-7836
Facsimile: (212) 549-2539

/s/ Leah C. Aden
Leah C. Aden*
*laden@naacpldf.org*
John S. Cusick*
*jcusick@naacpldf.org*
NAACP LEGAL DEFENSE AND
EDUCATION FUND
40 Rector Street, 5th Floor
New York, New York 10006
Telephone: (212) 965-2200
Facsimile: (212) 226-7592


/s/ Debo P. Adegbile
Debo P. Adegbile*
*debo.adegbile@wilmerhale.com*
Ilya Feldsherov*
*ilya.feldsherov@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Facsimile: (212) 230-8888


George P. Varghese*
*george.varghese@wilmerhale.com*
Stephanie Lin*
*stephanie.lin@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000
Facsimile: (617) 526-5000

/s/ *Adam S. Sieff*
Adam S. Sieff*
*adamsieff@dwt.com*
DAVIS WRIGHT TREMAINE LLP
865 South Figueroa Street, 24th Floor
Los Angeles, California  90017-2566
Telephone: (213) 633-6800
Facsimile:  (213) 633-6899

Kate Kennedy*
*katekennedy@dwt.com*
Matthew Jedreski*
*mjedreski@dwt.com*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610

Tania Faransso*
*tania.faransso@wilmerhale.com*
Webb Lyons*
*webb.lyons@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Ave. NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

Nana Wilberforce*
*nana.wilberforce@wilmerhale.com*
WILMER CUTLER PICKERING HALE
AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300
Facsimile: (213) 443-5400

*Attorneys for Plaintiffs*

*Pro Hac Vice Forthcoming